[No. A108410. First Dist., Div. Five. Nov. 19, 2010.]

ENVIRONMENTAL PROTECTION INFORMATION CENTER et al.,
Plaintiffs and Respondents, v.
DEPARTMENT OF FORESTRY AND FIRE PROTECTION et al.,
Defendants and Appellants.

[No. A108478. First Dist., Div. Five. Nov. 19, 2010.]

UNITED STEELWORKERS OF AMERICA et al., Plaintiffs and
Respondents, v.
DEPARTMENT OF FORESTRY AND FIRE PROTECTION, Defendant and
Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I., II.A., C.1., III.B., D., E., and F.

218

220

COUNSEL

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Mary E. Hackenbracht, Assistant Attorney General, John Davidson and William N. Jenkins, Deputy Attorneys General, for Defendants and Appellants.

Law Offices of Sharon E. Duggan, Sharon E. Duggan; Lippe Gaffney Wagner, Brian Gaffney; Law Offices of Richard M. Pearl and Richard M. Pearl for Plaintiffs and Respondents Environmental Protection Information Center et al.

Paul Whitehead; Altshuler Berzon, Jonathan Weissglass and Peder J. Thoreen for Plaintiff and Respondent United Steelworkers of America.

OPINION

SIMONS, J.—In *Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459 [80 Cal.Rptr.3d 28, 187 P.3d 888] (*EPIC II*), the California Supreme Court resolved the merits of a long-running legal dispute surrounding the logging of 211,000 acres of timberland owned by Pacific Lumber Company (Pacific Lumber) in Humboldt County. (*Id.* at pp. 470, 472.) Respondents Environmental

Protection Information Center and Sierra Club (hereafter, collectively, EPIC) and United Steelworkers of America (the Steelworkers) had challenged various administrative approvals issued to Pacific Lumber by California's Department of Forestry and Fire Protection (CDF) and the Department of Fish and Game (DFG).[1] EPIC and the Steelworkers prevailed in the trial court, and, in September 2004, the trial court awarded them attorney fees under Code of Civil Procedure section 1021.5 (section 1021.5).

The Agencies and Pacific Lumber appealed the trial court's judgment and the attorney fee awards to this court, and, in late 2005, we issued an opinion that substantially reversed the trial court's judgment on the merits. EPIC and the Steelworkers successfully sought review in the California Supreme Court, and we stayed briefing in the appeal from the attorney fee awards pending the Supreme Court's decision. In light of that decision resolving the merits of the underlying cases, we address the Agencies' appeals from the fee awards.

The Agencies argue that, in view of the outcome of the appeals in the underlying litigation, respondents are no longer entitled to attorney fees. The Agencies further argue that even if respondents are entitled to fees, the amounts awarded must be reduced to account for respondents' ultimate lack of success on the merits. Finally, the Agencies contend the trial court made a number of errors in determining the amount of the fees it awarded.

We agree with the Agencies that the fee awards must be reevaluated in light of the final outcome of the underlying litigation. We reverse the attorney fee orders and remand the matter to the trial court for redetermination of respondents' entitlement to fees and the appropriate amount of any fee award. To narrow the scope of the issues to be decided on remand and for the guidance of the trial court in the further proceedings, we resolve many of the issues raised by the parties in these appeals.

## FACTUAL AND PROCEDURAL BACKGROUND

The factual and procedural history of the underlying litigation is set forth in detail in the California Supreme Court's opinion in the merits appeals. (See *EPIC II, supra*, 44 Cal.4th at pp. 470–478.) Part of our recitation of the facts is drawn from that opinion, but we discuss only those matters relevant to the appeals from the fee awards.

---

[1] CDF recently changed its acronym to CAL FIRE, but we use the former acronym because that is the one by which the agency was known during the underlying litigation. (See *EPIC II, supra*, 44 Cal.4th at p. 473, fn. 2.) In this opinion, we will refer to CDF and DFG collectively as "the Agencies" save when context requires that they be identified individually.

*The Headwaters Agreement and the Administrative
Proceedings*

The underlying litigation arose from an agreement (the Headwaters Agreement) among Pacific Lumber, the State of California, and the United States. (*EPIC II, supra,* 44 Cal.4th at p. 470.) The Headwaters Agreement "was intended to settle matters of litigation and public controversy surrounding the intensive logging of old growth redwoods and other trees on Pacific Lumber's property in Humboldt County." (*Ibid.*) Under the Headwaters Agreement, the state and federal governments purchased a small portion of the property, and Pacific Lumber was permitted to log the remainder, provided it obtained certain regulatory approvals from state and federal agencies. (*Ibid.*) These approvals are "supported by a document or documents that are to some degree interrelated with the others." (*Id.* at p. 471.)

Pacific Lumber submitted for approval (1) a Sustained Yield Plan (SYP) under Public Resources Code section 4551.3; (2) a state Incidental Take Permit under the California Endangered Species Act (CESA) (Fish & G. Code, § 2050 et seq.); (3) an application for a Streambed Alteration Agreement under Fish and Game Code former section 1603; and (4) as required by federal law, a Habitat Conservation Plan (HCP). (*EPIC II, supra,* 44 Cal.4th at pp. 471–472.) As part of the approval process, the federal and state agencies decided to prepare for the state SYP and the federal HCP a joint environmental impact report (EIR) under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) and an environmental impact statement (EIS) under the National Environmental Policy Act of 1969 (42 U.S.C. § 4321 et seq.). (*EPIC II,* at p. 472.) Congress required Pacific Lumber to obtain these approvals by March 1, 1999. (Department of the Interior and Related Agencies Appropriations Act, 1998, Pub.L. No. 105-83, § 501(b) (Nov. 14, 1997), 111 Stat. 1543, 1611 (hereafter, Appropriations Act).) "The approvals were timely obtained, in some cases right at the March 1 deadline." (*EPIC II,* at p. 470.)

*Respondents' Actions for Administrative Mandamus*

On March 31, 1999, EPIC filed an action for administrative mandamus seeking to set aside four agency decisions: (1) CDF's approval of the SYP, (2) DFG's issuance of the Incidental Take Permit, (3) DFG's approval of the Streambed Alteration Agreement, and (4) CDF's and DFG's findings and certification of the EIS/EIR prepared for the SYP, the Incidental Take Permit, and the Streambed Alteration Agreement. It also prayed for an injunction prohibiting the Agencies and Pacific Lumber from authorizing or engaging in any timber operations pursuant to any Timber Harvest Plan (THP) that relied on the SYP or the Streambed Alteration Agreement. Finally, EPIC

requested reasonable attorney fees under section 1021.5 On that same date, the Steelworkers filed a petition for administrative mandamus challenging only the SYP on grounds similar to those EPIC raised. Like EPIC, the Steelworkers requested an award of attorney fees. Both EPIC and the Steelworkers later filed amended petitions that are the operative pleadings in this case.

On July 22, 2003, the trial court issued separate statements of decision ruling on the two petitions. It found both EPIC and the Steelworkers entitled to issuance of writs of mandate. The trial court rejected respondents' arguments that the Agencies' decisions were unsupported by substantial evidence, but ruled in respondents' favor on virtually every other issue raised. It concluded "that the SYP was deficient on a number of grounds, and that the state Incidental Take Permit, Streambed Alteration Agreement and CEQA findings were all inadequate and represented a failure to comply with the law" on the Agencies' part. (*EPIC II, supra*, 44 Cal.4th at pp. 477–478.) The trial court later issued supplemental statements of decision enjoining "timber operations conducted pursuant to any post-July 22[, 2003] THP which relied upon the SYP, [Incidental Take Permit] or Streambed Alteration Agreement."

*The Attorney Fee Awards*

After issuance of the statements of decision, EPIC and the Steelworkers moved for awards of attorney fees under section 1021.5. The Agencies opposed both motions. On September 24, 2004, the trial court issued similar orders in both cases, awarding attorney fees to EPIC ($4,279,915.74) and the Steelworkers ($1,787,806.21).

In its orders, the trial court found that EPIC and the Steelworkers had satisfied all of section 1021.5's conditions for entitlement to an award of fees.[2] Specifically, it found respondents were successful parties and determined their actions had vindicated important rights affecting the public interest. It further found their actions had conferred a significant benefit on the general public and that private enforcement of the rights vindicated in the actions was necessary.

---

[2] Section 1021.5 provides in pertinent part: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. . . ."

In calculating the amount of the awards, the trial court allowed respondents to recover fees for some of the time their counsel had spent in the administrative proceedings prior to the commencement of the litigation. In addition, in setting the lodestar amount, the court chose to use the prevailing hourly rates for attorneys in San Francisco, where respondents' counsel were located, rather than the rates prevailing in Humboldt County. After considering a number of factors, the court enhanced the fee award by applying a lodestar multiplier of 2.0.

### The Appeals on the Merits

The trial court entered judgments and issued peremptory writs of mandate on October 31, 2003. The Agencies timely appealed to this court from both the underlying judgments and the related attorney fee orders. We consolidated the appeals for briefing, argument, and decision.

On December 12, 2005, we issued our opinion in *Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection** (Cal.App.) (*EPIC I*), reversing the trial court's judgments on the merits and remanding the matter for further proceedings. Our opinion "reversed the trial court on almost every point and upheld each of the regulatory approvals at issue." (*EPIC II, supra,* 44 Cal.4th at p. 470.) The Supreme Court granted review on March 29, 2006, and, on April 12, we stayed the appeals from the orders awarding attorney fees. On February 14, 2007, the case in the Supreme Court was stayed because Pacific Lumber filed for chapter 11 bankruptcy. The stay was lifted on August 1, 2007.[3]

On July 17, 2008, the Supreme Court issued its decision, affirming our opinion in most respects, but reversing on certain issues. (See *EPIC II, supra,* 44 Cal.4th at pp. 470–471, 526–527.) It set aside CDF's approval of the SYP, holding that the agency had failed to produce a single, identifiable document, and it agreed with EPIC that the SYP was required to include individual watershed planning analyses. (*Id.* at pp. 491–497, 500–504.) It rejected all other challenges respondents made to the SYP. (*Id.* at pp. 482–491, 497–499, 504–506.) Addressing a question of first impression, our state's high court held the "no surprises clauses" included in the state Incidental Take Permit was

---

*Reporter's Note: Review granted on March 29, 2006, S140547. For Supreme Court opinion, see 44 Cal.4th 459.

[3] On June 18, 2009, we received notice of the adoption and completion of the chapter 11 plan of reorganization for Pacific Lumber and its related entities. The claims against those entities were fully discharged and those entities ceased to exist. On June 23, 2009, we dismissed Pacific Lumber's appeal and issued our remittitur in that case. Pacific Lumber is therefore no longer a party to these appeals.

inconsistent with Fish and Game Code section 2081, subdivision (b)(2).[4] (*EPIC II*, at pp. 506–514.) It left to the trial court on remand to decide whether the clauses could be severed and the rest of the Incidental Take Permit reinstated. (*Id.* at p. 526.) The Supreme Court rejected the remainder of EPIC's challenges to the permit. (*Id.* at pp. 515–517.) It also disagreed with all of EPIC's contentions regarding the validity of the Streambed Alteration Agreement and upheld that document. (*Id.* at pp. 518–521.) Finally, the court upheld the EIS/EIR against all of the challenges EPIC raised against it. (*Id.* at pp. 521–526.)

After the Supreme Court issued its decision in *EPIC II*, we lifted the stay in these appeals and the parties completed briefing.[5]

## DISCUSSION

The Agencies attack the orders awarding attorney fees on a number of grounds. They first assert the fee awards are improper because respondents have failed to satisfy two of the conditions set forth in section 1021.5. Specifically, the Agencies claim EPIC and the Steelworkers cannot demonstrate that their litigation conferred a "significant benefit . . . on the general public or a large class of persons" or that "the necessity . . . of private enforcement . . . [is] such as to make the award appropriate . . . ." (§ 1021.5, subds. (a), (b).) These arguments attack respondents' entitlement to a fee award.

In the alternative, the Agencies argue that even if respondents are entitled to an award, the amount of the fees granted is excessive. Principally, they contend the fee awards must be reduced to reflect the limited success respondents achieved after the appeals on the merits. The Agencies further contend the amounts awarded should be reduced because EPIC and the Steelworkers duplicated each other's efforts. Finally, appellants assert the trial court abused its discretion by (1) awarding fees for counsel's work in the administrative proceedings, (2) compensating counsel using San Francisco rates rather than Humboldt County rates, (3) enhancing the fee award with a multiplier, (4) awarding improper litigation expenses, and (5) excluding an expert declaration.

---

[4] "No surprises clauses" are provisions in an incidental take permit that limit in advance the permit holder's obligation to mitigate various impacts on endangered and threatened species. (*EPIC II, supra*, 44 Cal.4th at p. 507.)

[5] On September 17, 2009, the trial court vacated submission of respondents' motions for attorney fees on appeal. The trial court orders state that respondents' motions "will be calendared for further proceedings following the filing herein of a remittitur from the Court of Appeal after its decision upon an appeal now pending in that court from an order of this court awarding attorney fees for trial court services."

Although the parties seek to avoid a remand and the expense of further fee litigation, we conclude a reviewing court should not decide in the first instance all of the issues presented. We resolve those issues properly within our purview, and, in the interests of judicial economy and for the guidance of the trial court on remand, we address certain other issues. (See *Californians for Responsible Toxics Management v. Kizer* (1989) 211 Cal.App.3d 961, 970 [259 Cal.Rptr. 599].)

I. *The Fee Award Must Be Reconsidered in Light of the Appellate Proceedings**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II. *Issues of Entitlement—Significant Benefit and Necessity*

 A. *Requirements for Attorney Fee Awards Under Section 1021.5**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

 B. *Significant Benefit*

Before addressing the parties' contentions about whether the litigation conferred a significant benefit within the meaning of section 1021.5, we resolve two preliminary questions. First, should we make the initial determination of significant benefit, or should we leave the matter to the trial court on remand? Second, does the analysis of significant benefit require that we "balance" the benefits conferred on the public by each side in the litigation, rather than simply considering the benefit conferred by the result obtained by the successful party?

 1. *An Appellate Court Is Better Positioned to Determine Whether an Appellate Decision Has Conferred a Significant Benefit*

The Agencies and the Steelworkers agree that we should decide the significant benefit question ourselves. EPIC, however, contends we must defer to the trial court's determination of the matter because the issues presented are primarily factual. We disagree with EPIC and exercise our discretion to make this determination ourselves.

First, the California Supreme Court has made clear it is within our discretion to decide which court is better equipped to make the initial

---

*See footnote, *ante*, page 217.

determination whether to award fees under section 1021.5. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 427 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights*).) If convinced we are in a position to assess the propriety of an award, we may make determinations regarding fee entitlement. (*City of Fresno v. Press Communications, Inc.* (1994) 31 Cal.App.4th 32, 43 [36 Cal.Rptr.2d 456].)

Second, where the claim of significant benefit rests on an appellate opinion, it may be more appropriate for this court, rather than the trial court, to decide whether the case qualifies for a fee award. (See *Laurel Heights, supra*, 47 Cal.3d at p. 427.) Like the Second District in *Los Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1 [232 Cal.Rptr. 697] (*L.A. Police Protective League*), we find "it crucial to distinguish between two situations—when the trial court is considering a court-awarded fee where the litigation began *and ended* at the trial level as contrasted with one which resulted in an appellate decision. In the former situation, the trial court may well be in a better position than the appellate court to assess whether what happened in that court . . . 'conferred a significant benefit on the general public or a large class of persons.' Accordingly, the appellate court owes the trial court a full measure of deference in deciding whether the trial court abused its discretion. But the second situation is something quite different. An appellate court is in at least as good a position as the trial court to judge whether . . . its own opinion is 'important' and 'protects the public interest' and whether the existence of that opinion confers a 'significant benefit on the general public or a large class of persons.' " (*Id.* at pp. 7–8.)

We have previously endorsed this approach and held that although the decision to award attorney fees under section 1021.5 lies initially with the trial court, "this court is equally well positioned to determine if [an appellate] opinion . . . yielded a significant benefit." (*Schmier v. Supreme Court* (2002) 96 Cal.App.4th 873, 880 [117 Cal.Rptr.2d 497].) Indeed, where a request for fees is based entirely upon the success a party has obtained on appeal, we have stated "we are *better equipped* than the trial court to decide whether an award of fees is appropriate." (*Lindelli v. Town of San Anselmo* (2006) 139 Cal.App.4th 1499, 1516 [43 Cal.Rptr.3d 707], italics added.) This conclusion follows from the nature of the significant benefit inquiry. "How many people will receive what kind of benefit, and how much, as a result of a given legal action is usually more of a value judgment than an issue of fact. And most often it is a value judgment about legal effects and the like which appellate courts are well situated to make." (*L.A. Police Protective League, supra*, 188 Cal.App.3d at p. 9.) In some cases, it may be useful for the trial court to take evidence about either the size of the affected population or the predicted quantitative impact of the litigation, particularly where money is involved. (*Ibid.*) But such evidence is not always required, particularly where the

claimed substantial benefit is conceptual or doctrinal. (*Planned Parenthood v. Aakhus* (1993) 14 Cal.App.4th 162, 171–172 [17 Cal.Rptr.2d 510].)

We recognize that the present appeals differ from cases such as *L.A. Police Protective League* because we are not assessing the impact of our own opinion. Instead, we are making a "value judgment about [the] legal effects" of *EPIC II*. (*L.A. Police Protective League, supra,* 188 Cal.App.3d at p. 9.) For present purposes, however, we find this distinction unimportant. First, the interpretation of a Supreme Court opinion is an issue of law (*In re Groundwater Cases* (2007) 154 Cal.App.4th 659, 674 [64 Cal.Rptr.3d 827]), and deciding questions of law is the province of appellate courts (*In re Zeth S.* (2003) 31 Cal.4th 396, 405 [2 Cal.Rptr.3d 683, 73 P.3d 541]). Second, if we were to remand the significant benefit question to the trial court, it would also have to evaluate the legal effects of *EPIC II*. It would thus be asked to do exactly what we do here—assess the significance of another court's opinion.[8]

Further, contrary to EPIC's contention, the trial court's findings on this point were not based on factual considerations and are not entitled to deference. The trial court cited three reasons in support of its determination. First, it concluded the action had resulted in the effectuation of fundamental legislative policies favoring the protection of valuable natural resources. As additional support for its finding, it cited the effectuation of a regulatory policy requiring consideration of regional economic vitality and employment in managing forest resources. Finally, it concluded its decision "may prove instructive to public officials charged with the responsibility for implementing those policies." None of these reasons involves any kind of factual inquiry on which deference might be appropriate. Instead, they constitute the trial court's evaluation of the legal effects of its decision, and thus "[t]here is no good reason for an appellate court to defer to a trial court's value judgment on that question . . . ." (*L.A. Police Protective League, supra,* 188 Cal.App.3d at p. 9.) Moreover, as previously discussed, the appellate proceedings in this case have altered the circumstances we must consider in determining the gains that have resulted from this case. (*Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 939–940 [154 Cal.Rptr. 503, 593 P.2d 200] (*Woodland Hills*).) We are better positioned to make the substantial benefit determination than is the trial court, and we owe it no

---

[8] Our case differs from the Fifth District's recent opinion in *Ebbetts Pass Forest Watch v. Department of Forestry & Fire Protection* (2010) 187 Cal.App.4th 376 [114 Cal.Rptr.3d 351] (*Ebbetts Pass*). In that case, the Court of Appeal reviewed a trial court's order denying attorney fees after the California Supreme Court had finally resolved the underlying lawsuit. (*Id.* at pp. 380, 381.) The Court of Appeal stated it would review the trial court's decision to deny attorney fees for abuse of discretion. (*Id.* at p. 381.) In that case, the trial court's attorney fee decision was made *after* the California Supreme Court had issued its opinion. (*Id.* at p. 380.) Unlike the trial court in this case, the trial court in *Ebbetts Pass* based its decision on the Supreme Court's opinion, rather than upon its own order. (*Ibid.*)

deference on this question. (See *National Parks & Conservation Assn. v. County of Riverside* (2000) 81 Cal.App.4th 234, 239 [96 Cal.Rptr.2d 576] (*National Parks*) [Court of Appeal owes no deference to trial court's fee determination after reversal on the merits].)[9]

## 2. *Balancing the Benefits*

In assessing whether this case has resulted in a significant benefit, the Agencies ask us to adopt a novel approach. They contend "that a court's inquiry into significant benefit must balance the benefits that both parties conferred on the public through the litigation, to determine whether there was any net significant benefit bestowed on the public by [respondents]." The Agencies argue that our assessment of the fee award should be analogous to the type of assessment a court makes in deciding whether to issue a preliminary injunction, and ask us to "make clear that the courts must balance the respective equities of the benefits and detriments conferred by each party to the suit, and deny fees if on balance no net benefit has been conferred by the [respondents] on a large class of individuals or the general public." In the Agencies' view, their conduct in the litigation was the minimum required by their obligations to the public, and they argue that a miscarriage of justice would have resulted had they not defended their approvals and, instead, allowed judicial rejection of their actions on the grounds asserted by EPIC and the Steelworkers. We disagree that courts making the significant benefit determination must engage in the type of balancing the Agencies suggest.

First, the Agencies point to nothing in the statutory text that supports their argument. (See *Adoption of Joshua S.* (2008) 42 Cal.4th 945, 955–956 [70 Cal.Rptr.3d 372, 174 P.3d 192] [language of § 1021.5 is most reliable guide to legislative intent].) The statute asks whether the successful party's action has conferred a "significant benefit" (§ 1021.5, subd. (a)), not, as the Agencies would have it, a "net significant benefit." We are disinclined to adopt a construction of the statute that "neither the context nor the language of section 1021.5 demands." (*In re Head* (1986) 42 Cal.3d 223, 232 [228 Cal.Rptr. 184, 721 P.2d 65].)

Second, while the Agencies correctly note that section 1021.5 "already embraces the idea that a party can confer a significant benefit on the public

---

[9] Indeed, despite its claim that we must defer to the trial court's findings on the significant benefit question, in this court EPIC relies on the effect of the Supreme Court's ruling as support for its significant benefit argument. EPIC goes so far as to acknowledge that the "Supreme Court rulings will have far greater precedential value than the trial court's decision." Thus, EPIC at least implicitly recognizes that the significant benefit determination now depends far less upon the relief granted by the trial court than it does upon the precedential value of the Supreme Court's opinion.

by a successful defense," this fact actually undermines their position. Section 1021.5 permits successful defendants to recover attorney fees, but only when the defendants otherwise satisfy the statutory criteria for an award. (See, e.g., *Wal-Mart Real Estate Business Trust v. City Council of San Marcos* (2005) 132 Cal.App.4th 614, 621–624 [33 Cal.Rptr.3d 817] [real parties in interest entitled to fees under § 1021.5 where they successfully opposed developer's petition for writ of mandate to preclude or delay referendum].) The statute makes no distinction between the plaintiffs and the defendants for purposes of attorney fee awards. (*Hull v. Rossi* (1993) 13 Cal.App.4th 1763, 1768 [17 Cal.Rptr.2d 457].) It allows a "successful party"—be it a plaintiff or defendant—to recover attorney fees from "one or more opposing parties" if the remaining statutory criteria are met. (§ 1021.5.) In awarding attorney fees to successful defendants, however, courts do not balance the relative benefits conferred by the opposing parties' positions; they ask only whether the successful party's action has conferred a significant benefit on the general public or a large class of persons. (See *Hull v. Rossi*, at pp. 1768–1769.)

Third, the Agencies' reliance on *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553 [21 Cal.Rptr.3d 331, 101 P.3d 140] (*Graham*) is misplaced. That case does not hold that a court's exercise of discretion in awarding attorney fees is analogous to the assessment courts make in deciding whether to issue a preliminary injunction. Instead, *Graham* referred to the preliminary injunction standards only in describing a limitation that case placed on the "catalyst theory" of attorney fee recovery[10]—that a plaintiff's lawsuit have some merit and not be frivolous. (*Graham*, at pp. 575–576.) The element of the preliminary injunction test to which *Graham* referred, the likelihood of success on the merits, is separate and distinct from the balancing of the equities between the parties. (See *Robbins v. Superior Court* (1985) 38 Cal.3d 199, 206–207 [211 Cal.Rptr. 398, 695 P.2d 695] [distinguishing two prongs of test for issuance of preliminary injunction].) *Graham* does not assist the Agencies.

Finally, as respondents point out, the Agencies' argument is misconceived. To the extent the Agencies rely on their success on a number of issues in the Supreme Court, their argument is not properly viewed as an attack on respondents' *entitlement* to attorney fees, but as an argument that the lodestar *amount* should be reduced because respondents achieved less than complete success in this litigation. (See, e.g., *Wallace v. Consumers Cooperative of*

---

[10] Under the catalyst theory, attorney fees may be awarded "even when litigation does not result in a judicial resolution if the defendant changes its behavior substantially because of, and in the manner sought by, the litigation." (*Graham, supra,* 34 Cal.4th at p. 560.) Thus, "the catalyst theory . . . does not require 'a judicially recognized change in the legal relationship between the parties' as a prerequisite for obtaining attorney fees under . . . section 1021.5." (*Tipton-Whittingham v. City of Los Angeles* (2004) 34 Cal.4th 604, 608 [21 Cal.Rptr.3d 371, 101 P.3d 174].)

*Berkeley, Inc.* (1985) 170 Cal.App.3d 836, 846–847 [216 Cal.Rptr. 649] [fact that successful party "has prevailed on some claims but not on others is a factor to be considered in determining the *amount* of the fee awarded" (italics added)].) Our conclusion is reinforced by the Agencies' own argument, for they request that in balancing the benefits, we consider whether the benefit conferred by this litigation is sufficiently significant "that the taxpayer should be required to suffer the additional burden of paying [respondents'] counsel's fees." That an award against the state will ultimately fall upon the taxpayers is a factor traditionally considered when a court makes adjustments to the lodestar amount, not when it determines whether the litigation's benefit is significant. (See *Serrano v. Priest* (1977) 20 Cal.3d 25, 49 [141 Cal.Rptr. 315, 569 P.2d 1303].)

### 3. *The Litigation Has Resulted in a Significant Benefit to the General Public*

The Agencies' principal argument is that the litigation has not resulted in any significant benefit to the environment because nearly all the claimed environmental protection and sustainable timber harvest aspects of respondents' lawsuits "have been erased by the review[ing] courts' opinions." As a practical matter, this argument rests on the contention that respondents' victory in the trial court, itself, conferred no benefit on the public. The Agencies minimize the significance of invalidating the state Incidental Take Permit and SYP, because a permit holder must still obtain a federal incidental take permit which is conditioned on including every term of its HCP. Thus implementation of the HCP is ensured whether or not state approvals are properly granted.

■ Even if this argument is accurate, a question we do not decide, it misses the mark. "[T]he 'significant benefit' that will justify an attorney fee award need not represent a 'tangible' asset or a 'concrete' gain but, in some cases, may be recognized simply from the effectuation of a fundamental constitutional or statutory policy." (*Woodland Hills, supra*, 23 Cal.3d at p. 939.) The benefit may be conceptual or doctrinal (*Planned Parenthood v. Aakhus, supra*, 14 Cal.App.4th at p. 171), and the California Supreme Court has recognized that "the litigation underlying the section 1021.5 award can involve rights or benefits that are somewhat intangible . . ." (*Adoption of Joshua S., supra*, 42 Cal.4th at p. 958). Looking solely at the Supreme Court's opinion in this case, we conclude that the litigation has resulted in a significant benefit within the meaning of the statute.

■ First, both the Steelworkers and EPIC successfully challenged the validity of the SYP. The Supreme Court held the SYP invalid because it was not a single, consolidated document CDF and the public could use in

monitoring compliance with the plan's provisions. (*EPIC II, supra*, 44 Cal.4th at pp. 491–497.) The Agencies discount the importance of this holding, arguing the Supreme Court's decision "was based on well established law, and presented no novel issue." They contend "this point of law will not have significant application outside the unique circumstances of this case." We disagree. The Supreme Court expressly held "that an identifiable SYP was never properly approved and must be resubmitted for approval." (*Id.* at p. 504.) We assume CDF will respond to the Supreme Court's opinion by "resubmitting an adequate, identifiable SYP for approval" (*id.* at p. 497), and by exercising greater care in the preparation of future plans. This will enhance effective public review of future logging at the site and increase participation in environmental decisionmaking, as well as improve CDF's procedures. This certainly supports a determination of significant benefit. (See *Protect Our Water v. County of Merced* (2005) 130 Cal.App.4th 488, 496 [30 Cal.Rptr.3d 202] [significant benefit even if court's opinion "had no more effect than to prompt the County [of Merced] to alter for the better its methods of creating and managing its CEQA records"].) These factors, when added to the fact that this litigation is the first time the Supreme Court has addressed the sufficiency of an SYP, justify the conclusion that respondents' litigation conferred a significant public benefit. (See *EPIC II*, at p. 482, fn. 6 [noting that issues raised "with respect to SYP's are ones of first impression"]; *County of Colusa v. California Wildlife Conservation Bd.* (2006) 145 Cal.App.4th 637, 655–656 [52 Cal.Rptr.3d 1] [finding of significant benefit supported by fact that project was first of its kind and litigation provided first test of agency's legal position].) The extent of the public benefit "need not be great" to justify an attorney fee award, and we therefore conclude *EPIC II*'s holding regarding the necessity of creating a single, integrated SYP qualifies as a significant benefit. (See *RiverWatch v. County of San Diego Dept. of Environmental Health* (2009) 175 Cal.App.4th 768, 781 [96 Cal.Rptr.3d 362] (*RiverWatch*).) Both the Steelworkers and EPIC contributed to this result.

Other aspects of the Supreme Court's opinion only serve to strengthen EPIC's argument that its litigation conferred a significant benefit on the public. The Supreme Court held, for the first time, that no surprise clauses were inconsistent with the language of Fish and Game Code section 2081, subdivision (b)(2), which requires that the impacts of an authorized take of an endangered or threatened species be "minimized and fully mitigated." (*EPIC II, supra*, 44 Cal.4th at pp. 507, 509–514.) The Supreme Court's decision thus sets a precedent that will apply to future state incidental take permits issued under CESA. While an action need not create new law to satisfy the significant benefit criterion of section 1021.5 (*Press v. Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 318–319 [193 Cal.Rptr. 900, 667 P.2d 704]), the fact that EPIC's action did so weighs in favor of a finding of significant

benefit (e.g., *Bouvia v. County of Los Angeles* (1987) 195 Cal.App.3d 1075, 1084–1086 [241 Cal.Rptr. 239]).

Moreover, the Supreme Court's opinion held the final SYP insufficient because the document failed to include individual watershed planning analyses to address the cumulative impacts of logging and to support the sustained yield estimate. (*EPIC II, supra,* 44 Cal.4th at pp. 500–504.) The Supreme Court held that any resubmitted plan must include such analyses and that in considering whether to approve the resubmitted plan, CDF must decide "whether the information on individual planning watersheds complies with the Forest Practice Rules and is adequate to support Pacific Lumber's long-term sustained yield estimate." (*Id.* at p. 504.) As a result of this holding, we assume any resubmitted SYP will more accurately analyze the impacts of the proposed logging on individual planning watersheds. This provides further support for a determination that this litigation has resulted in a significant benefit. (See *RiverWatch, supra,* 175 Cal.App.4th at p. 781 [action that resulted in requiring agencies to assess traffic impacts associated with project conferred significant benefit].)

Finally, as the Supreme Court noted in *EPIC II,* in *EPIC I* we held "DFG erred in issuing a permit in advance for [13] unlisted species, concluding that Pacific Lumber must seek new permits if and when the species become listed. [We] concluded that this provision must be severed from the Incidental Take Permit." (*EPIC II, supra,* 44 Cal.4th at p. 507, fn. 18.) That portion of our holding was not challenged in the Supreme Court. (*Ibid.*) As a result, new permits will have to be sought in the future should these species become listed. This additional protection for these currently unlisted species adds further weight to our conclusion that this litigation has resulted in a significant benefit.

In conclusion, the Supreme Court's holding regarding the invalidity of the SYP, together with the others discussed above, are more than enough to merit a determination that EPIC's action conferred a significant benefit on the public within the meaning of section 1021.5. We therefore hold that both respondents have satisfied this criterion for entitlement to an award of attorney fees.

C. *The Necessity of Private Enforcement*

The Agencies contend respondents are not entitled to a fee award because they cannot show "the necessity and financial burden of private enforcement . . . are such as to make the award appropriate . . . ." (§ 1021.5, subd. (b).) According to the Agencies, because respondents failed to make reasonable settlement efforts at any time, EPIC and the Steelworkers cannot

establish that they were forced to litigate in order to achieve what the Agencies characterize as a *narrow* victory. Appellants argue EPIC and the Steelworkers must show that they were willing to settle these actions "on terms approaching the narrow result achieved by this litigation" in order to demonstrate this action was necessary.[11]

### 1. *The Agencies Have Not Forfeited Their Necessity Argument**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### 2. *The Relevance of Prelitigation Settlement Efforts*

■ In *Graham, supra,* 34 Cal.4th 553, the California Supreme Court added a limitation to the catalyst theory of attorney fee recovery. The Supreme Court held that a plaintiff seeking attorney fees under a catalyst theory "must first reasonably attempt to settle the matter short of litigation." (*Id.* at p. 577.) It made clear, however, that "[l]engthy prelitigation negotiations are not required, . . . but a plaintiff must at least notify the defendant of its grievances and proposed remedies and give the defendant the opportunity to meet its demands within a reasonable time." (*Ibid.*)

*Vasquez v. State of California* (2008) 45 Cal.4th 243 [85 Cal.Rptr.3d 466, 195 P.3d 1049] (*Vasquez*), refused to make prelitigation settlement negotiations a prerequisite to an award of attorney fees under section 1021.5 in noncatalyst cases. (*Vasquez,* at p. 259.) The Supreme Court declined to "impose such a categorical requirement," but it explained that "[i]n determining . . . whether 'the necessity and financial burden of private enforcement . . . are such as to make the award appropriate' (§ 1021.5), a court properly takes into consideration whether the party seeking fees attempted to resolve the matter without litigation." (*Vasquez,* at p. 251.) Thus, when a court seeks to determine whether an action was "necessary" within the meaning of the statute, "settlement efforts (or their absence) are relevant *in every case.*" (*Id.* at p. 258.) In assessing such information, "the trial court exercises its equitable discretion in light of all the relevant circumstances." (*Id.* at pp. 258–259, fn. omitted.) The *Vasquez* court laid out a number of factors a court might consider in this regard. For example, "failed attempts to settle can help to demonstrate that litigation was necessary, but the absence of settlement attempts does not logically or necessarily demonstrate the contrary.

---

[11] The necessity requirement " '. . . really examines two issues: whether private enforcement was necessary and whether the financial burden of private enforcement warrants subsidizing the successful party's attorneys.' [Citation.]" (*Lyons v. Chinese Hospital Assn.* (2006) 136 Cal.App.4th 1331, 1348 [39 Cal.Rptr.3d 550].) The Agencies' arguments are directed exclusively to the first of these two issues.

*See footnote, *ante,* page 217.

Depending on the circumstances of the case, attempts to settle may have been futile, exigent circumstances may have required immediate resort to judicial process, or prior efforts to call the problem to the defendant's attention . . . may have been rebuffed." (*Id.* at p. 252.) On the other hand, "[t]hat a plaintiff for tactical reasons might choose not to propose, or not to accept, a reasonable settlement offer is thus, in every case, a circumstance that potentially weighs against an award of fees." (*Id.* at p. 259.)

EPIC claims it satisfied any prelitigation settlement requirements because it exhausted its administrative remedies. We disagree that a party's exhaustion of its administration remedies will necessarily satisfy prelitigation settlement requirements in every case. The purpose of the doctrine of exhaustion of administrative remedies is to give the administrative agency the opportunity to decide matters within its area of expertise prior to judicial review. (E.g., *California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 616 [91 Cal.Rptr.3d 571].) The doctrine is premised on the notion that the agency "is entitled to learn the contentions of interested parties before litigation is instituted." (*Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247, 267 [104 Cal.Rptr. 761, 502 P.2d 1049].) Informing the agency of these contentions gives the agency "its opportunity to act and to render litigation unnecessary," if it chooses to do so. (*Ibid.*)

Exhaustion thus ensures the agency will be informed of the full range of an interested party's objections. Litigation may still ensue, however, if the agency agrees with some of a party's objections but disagrees with others. (Cf. *Williams v. Housing Authority of Los Angeles* (2004) 121 Cal.App.4th 708, 722 [17 Cal.Rptr.3d 374] [noting that exhaustion "can serve to reduce the scope of the litigation"].) While an interested party might raise a large number of objections to a particular administrative decision, some of its objections will likely be weightier than others. A party might well choose not to litigate if it can persuade the agency to address its most important concerns, even if its less significant objections will go unmet. The question a trial court must address in making its necessity determination is whether a reasonable settlement offer might have prevented a lawsuit. (See *Graham, supra,* 34 Cal.4th at p. 577.) This question cannot be answered simply by identifying the entire universe of a party's objections to an agency's decision.

We emphasize the limited nature of our holding on this point. Because we must remand the attorney fees issue to the trial court in any event, we simply direct the trial court to *consider* the question of settlement efforts in determining whether private enforcement was sufficiently necessary to justify an award of fees, since those efforts are relevant to, though not determinative of, the necessity decision in every case. (*Vasquez, supra,* 45 Cal.4th at p. 258.) The necessity determination is a matter on which "the trial court exercises its equitable discretion in light of all the relevant circumstances." (*Id.* at

pp. 258–259, fn. omitted.) We intimate no view on how the trial court should resolve the question. Our holding does no more than permit the parties the opportunity to present any evidence on this issue that they may have. (See *In re Marriage of Moschetta* (1994) 25 Cal.App.4th 1218, 1228 [30 Cal.Rptr.2d 893].)

III. *The Amount of the Fee Award*

 A. *Reductions for Limited Success*

 1. *Setting the Lodestar and Accounting for Limited Success*

■ Where attorney fees are available under section 1021.5, the California Supreme Court has embraced the lodestar method for determining the appropriate amount of fees to be awarded to a prevailing plaintiff. (See *Graham, supra,* 34 Cal.4th at p. 579.) "Under this method, a court assesses attorney fees by first determining the time spent and the reasonable hourly compensation of each attorney. [Citation.] The court next determines whether that lodestar figure should be adjusted based on various relevant factors [citation], including a plaintiff's limited success in the litigation [citations]." (*Mann v. Quality Old Time Service, Inc.* (2006) 139 Cal.App.4th 328, 342 [42 Cal.Rptr.3d 607].) California law, like federal law, considers the extent of a plaintiff's success a crucial factor in determining the amount of a prevailing party's attorney fees. (*Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 989 [104 Cal.Rptr.3d 710, 224 P.3d 41].) "Although fees are not reduced when a plaintiff prevails on only one of several factually related and closely intertwined claims [citation], 'under state law as well as federal law, a reduced fee award is appropriate when a claimant achieves only limited success' . . . ." (*Ibid.,* quoting *Sokolow v. County of San Mateo* (1989) 213 Cal.App.3d 231, 249 [261 Cal.Rptr. 520] (*Sokolow*).) The trial court may reduce the amount of the fee award "where a prevailing party plaintiff is actually unsuccessful with regard to certain objectives of its lawsuit." (*Sokolow,* at p. 249.)

■ California courts applying section 1021.5 in cases of limited success have adopted the approach set forth in *Hensley v. Eckerhart* (1983) 461 U.S. 424, 434 [76 L.Ed.2d 40, 103 S.Ct. 1933] (*Hensley*). (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1019 [113 Cal.Rptr.2d 625].) *Hensley* recognized that a plaintiff might join in one action "distinctly different claims for relief that are based on different facts and legal theories." (*Hensley,* at p. 434.) As a consequence, an attorney's work on one claim may be unrelated to work on another claim. (*Id.* at pp. 434–435.) Work on an unsuccessful and unrelated claim generally will not be compensable, as it "cannot be deemed to have been 'expended in pursuit of the ultimate result achieved.' [Citation.]"

(*Id.* at p. 435; see *Harman v. City and County of San Francisco* (2006) 136 Cal.App.4th 1279, 1310 [39 Cal.Rptr.3d 589] (*Harman I*).)

In cases of limited success, *Hensley* establishes a two-part inquiry. (*Harman v. City and County of San Francisco* (2007) 158 Cal.App.4th 407, 414 [69 Cal.Rptr.3d 750] (*Harman II*).) The first step asks whether "the plaintiff fail[ed] to prevail on claims that were unrelated to the claims on which he succeeded[.]" (*Hensley, supra*, 461 U.S. at p. 434; see *Harman II*, at pp. 417–418.) In the first step of the *Hensley* inquiry, charges included in the initial lodestar calculation are "subject to challenge . . . as being unrelated to the plaintiff's successful claims." (*Harman I, supra*, 136 Cal.App.4th at p. 1310.) Thus, this step requires a court to examine whether the prevailing party's unsuccessful claims are related to its successful ones. (*Hensley*, at pp. 434–435.) There is no certain method for determining when claims are related or unrelated, but *Hensley* "instructs the court to inquire whether the 'different claims for relief . . . are based on different facts and legal theories.' [Citation.] If so, they qualify as unrelated claims. Conversely, related claims 'will involve a common core of facts or will be based on related legal theories.' [Citation.]" (*Harman I*, at pp. 1310–1311.) " '. . . Under this analysis, an unsuccessful claim will be *un*related to a successful claim when the relief sought on the unsuccessful claim is intended to remedy a course of conduct entirely distinct and separate from the course of conduct that gave rise to the injury on which the relief granted is premised.' " (*Id.* at p. 1311, quoting *Mary Beth G. v. City of Chicago* (7th Cir. 1983) 723 F.2d 1263, 1279.)

If successful and unsuccessful claims are *related*, the court proceeds to the second step of *Hensley* inquiry, which asks whether "the plaintiff achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award." (*Hensley, supra*, 461 U.S. at p. 434.) In this step, the court will "evaluate the 'significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.' " (*Harman II, supra*, 158 Cal.App.4th at p. 417, quoting *Hensley, supra*, 461 U.S. at p. 435.) Full compensation may be appropriate where the plaintiff has obtained "excellent results," but may be excessive if "a plaintiff has achieved only partial or limited success." (*Hensley*, at pp. 435, 436.) "The court may appropriately reduce the lodestar calculation 'if the relief, however significant, is limited in comparison to the scope of the litigation as a whole.' " (*Harman I, supra*, 136 Cal.App.4th at p. 1312, quoting *Hensley*, at p. 440.)

The Agencies' arguments invoke both steps of the *Hensley* inquiry. They contend respondents failed to succeed on claims that were "unrelated" to those on which respondents prevailed. They also assert that even if the claims

are related, the hours expended by counsel are unreasonable in light of the overall results achieved in the litigation.

### 2. Hensley *Step One: Related and Unrelated Claims*

■ Our first task is to determine whether respondents' lawsuits encompass "distinctly different claims for relief that are based on different facts and legal theories."[13] (*Hensley, supra,* 461 U.S. at p. 434.) In making this determination, California courts have distinguished between unsuccessful "theories" and unsuccessful "claims." (See *Sokolow, supra,* 213 Cal.App.3d at pp. 249–250.) Courts have discretion to compensate a partially successful plaintiff for time spent on unsuccessful legal theories, provided such time was reasonably incurred. (*Id.* at p. 249.) But a reduction in the fee award may be appropriate where a plaintiff has failed to succeed on some of its claims. (*Id.* at p. 250.) The distinction between theories and claims is not always clear. As a general rule, however, California courts have tended to distinguish theories and claims by comparing the goals or objectives of the plaintiff's litigation with the relief ultimately obtained. (See *ibid.* [considering whether plaintiffs obtained all the relief sought in their complaint].) The rule might aptly be summarized as follows: "success counts and is to be judged . . . by the relief given or the right established." (Dobbs, *Reducing Attorneys' Fees for Partial Success: A Comment on* Hensley *and* Blum (1986) 1986 Wis. L.Rev. 835, 842.)

For example, in *Sokolow, supra,* 213 Cal.App.3d 231, plaintiff Sokolow, a woman, had been denied admission to an all-male mounted patrol that maintained a close relationship with a county sheriff's department. (*Id.* at pp. 236–237, 238.) Sokolow and another woman filed suit, seeking a number of different remedies: (1) a declaration that the patrol's bylaws restricting membership to men violated the equal protection clauses of the United States and the California Constitutions, (2) an injunction restraining the patrol from excluding qualified women from membership, or (3) in the alternative, an injunction restraining the county from maintaining any affiliation with the patrol. (*Sokolow,* at p. 239.) The trial court found the patrol was closely enough involved with the sheriff's department to subject it to the equal

---

[13] Both steps of the *Hensley* inquiry involve factual determinations usually committed to the trial court's discretion. (See, e.g., *Schwarz v. Secretary of Health & Human Services* (9th Cir. 1995) 73 F.3d 895, 903 [concluding district court was within its discretion in finding several of plaintiff's unsuccessful claims were unrelated to her lone successful claim].) We would therefore ordinarily leave it to the trial court to determine on remand whether respondents' actions consist of related or unrelated claims. (*Thorne v. City of El Segundo* (9th Cir. 1986) 802 F.2d 1131, 1142.) In this case, however, the parties agree that we may decide this question ourselves. Because we find that the proper application of *Hensley* and its California progeny would permit only one conclusion as a matter of law, we believe a remand on this issue would be futile. (See *George Hyman Constr. Co. v. Brooks* (D.C. Cir. 1992) 963 F.2d 1532, 1539.)

protection clauses, and required it to choose between its relationship with the department and its membership policy excluding women. (*Id.* at p. 240.) The patrol chose to sever its relationship with the sheriff's department rather than admit women. (*Id.* at p. 241.) The trial court denied the plaintiffs their attorney fees. (*Id.* at p. 242.)

After holding the plaintiffs were prevailing parties, the Court of Appeal reversed the trial court's decision, but concluded the plaintiffs were not entitled to the full amount of their attorney fee request. (*Sokolow, supra,* 213 Cal.App.3d at pp. 244–246, 248.) It held that "the degree or extent of appellants' success in obtaining the results which they sought must be taken into consideration in determining the extent of attorney fees which it would be *reasonable* for them to recover." (*Id.* at p. 248.) Noting that under both federal and state law, "a reduced fee award is appropriate when a claimant achieves only limited success" (*id.* at p. 249), the court concluded the plaintiffs "may not be said to have obtained all the *results* they sought" (*id.* at p. 250). Plaintiffs had not succeeded in obtaining the admission of women to the patrol, and they had not succeeded in entirely eliminating the county's training and use of the patrol. (*Ibid.*) As the court explained, "[t]hese were not merely *unsuccessful legal theories* which were ultimately unnecessary to the success of appellants' claims, upon which they entirely prevailed; to the contrary, they were important *goals* of appellants' lawsuit which they failed to obtain." (*Ibid.*, italics added.) On remand, the trial court was directed to take into consideration the plaintiffs' limited success when arriving at an award of reasonable attorney fees.[14] (213 Cal.App.3d at pp. 250–251.)

(a) *Relatedness of Claims in Actions Based on an Administrative Record*

Before analyzing whether respondents' claims are related for purposes of *Hensley*, we must resolve a dispute between the Agencies and EPIC over the relatedness of claims in actions based on an administrative record. The Agencies contend our analysis of the issue of limited success must take account of the fact that the actions below were for administrative mandamus under Code of Civil Procedure section 1094.5, "where the administrative record is static, and there is no dispute of fact similar to that presented by a

---

[14] The court in *Sokolow* distinguished an earlier case, *Sundance v. Municipal Court* (1987) 192 Cal.App.3d 268 [237 Cal.Rptr. 269] (*Sundance*), on the ground that in *Sundance*, "the plaintiffs had been entirely successful in obtaining their actual objectives" (changes to the procedures for the incarceration and treatment of public inebriates), although they had not prevailed on all legal theories at trial. (*Sokolow, supra,* 213 Cal.App.3d at pp. 249–250; see *Sundance,* at pp. 271, 273–274.) The Court of Appeal in *Sundance* stated that the trial court has discretion "to determine whether time spent on an unsuccessful legal theory was reasonably incurred," and that "all time reasonably spent should be compensated." (*Sundance,* at p. 274.)

trial." In such a case, the Agencies claim the amount of work required "is directly related to the breadth and aggressiveness of the legal challenge."

EPIC's view, in contrast, is "[t]hat the same record was involved for all claims . . . shows that all the facts and legal theories were based on *one course of conduct*: Appellants' approvals of [Pacific Lumber's] plans." EPIC contends it would necessarily review the entire administrative record even if it had asserted only those claims on which it ultimately succeeded. According to EPIC, it therefore follows that all of its challenges to the various approvals at issue in this litigation constitute related claims under *Hensley*.

 We find the Agencies' argument unpersuasive. In an action based on an administrative record, the amount of legal work is certainly related to the breadth of the legal challenge. That is, the more theories advanced to challenge an agency's action, the more attorney work required. But this is true in all legal actions, whether based on an administrative record or not. (Cf. *Graciano v. Robinson Ford Sales, Inc.* (2006) 144 Cal.App.4th 140, 145 [50 Cal.Rptr.3d 273] [plaintiff alleged 10 separate causes of action arising out of purchase of automobile]; *Harman I, supra*, 136 Cal.App.4th at pp. 1286–1287, 1309 [plaintiff filed actions in both state and federal court alleging multiple causes of action arising from adverse employment actions].) That the lawsuits below were actions for administrative mandamus does not make them unique in this respect. Furthermore, even in cases based on an administrative record, it is not true, as the Agencies assert, that success on any one legal theory "requires the same effort to present the entire case." While counsel will have to review the administrative record whether they raise one theory or a dozen, additional legal theories will normally require additional legal research, briefing, and argument. We therefore disagree that courts must necessarily treat actions for administrative mandamus differently when deciding whether to award attorney fees under section 1021.5.

In examining EPIC's contention that all of its claims are necessarily related because they arise out of a single administrative record, we find that California case law has not directly addressed the relatedness of claims in actions for administrative mandamus. (Cf. *National Parks, supra*, 81 Cal.App.4th at pp. 239–240 & fn. 4 [holding unrelated two challenges brought by same petitioner to two separate EIR's prepared for same landfill project].) We therefore look to federal decisional law for guidance, recognizing that it is only of "analogous precedential value." (*Serrano v. Unruh* (1982) 32 Cal.3d 621, 639, fn. 29 [186 Cal.Rptr. 754, 652 P.2d 985].)

The United States Court of Appeals for the District of Columbia Circuit (hereafter D.C. Circuit) addressed a similar question in *Sierra Club v. E.P.A.* (D.C. Cir. 1985) 248 U.S. App.D.C. 107 [769 F.2d 796]. In that case, the D.C.

Circuit was presented with a request for attorney fees under the federal Clean Air Act (42 U.S.C. § 7401 et seq.). (*Sierra Club v. E.P.A.*, at p. 799.) In the underlying litigation, the petitioners had challenged the Environmental Protection Agency (EPA) regulations governing the method of determining the permissible height of smokestacks for electric plants and other major sources of air pollution. (*Id.* at p. 802.) The petitioners "mounted a wide-ranging challenge to the legality of the regulations," and in its merits opinion, the D.C. Circuit "affirmed some of the EPA's regulations, reversed some as beyond the EPA's statutory authority, and remanded some for further consideration by the EPA in light of the court's opinion. [Citation.]" (*Ibid.*) In assessing the proper amount of attorney fees, the court chose to "divide the case into its component issues along the same lines as did the merits panel." (*Id.* at p. 803.) The court's explanation for doing so is worth quoting at length: "While all the issues in the case are related in the sense that they arise from the same set of regulations and the same administrative record, we do not believe that they are therefore inseparable for the purposes of attorney's fees. Each issue involves a particular substantive concern of the petitioners with a particular aspect of EPA's regulations. While the petitioners' legal theories are similar on many issues in the sense that they are grounded in the standard of our review prescribed in the Administrative Procedure Act, the different policy rationales and statutory provisions set forth by the agency as support for its decisions on different issues make the different claims legally distinct. The petitioners could be granted relief on any one issue without necessarily obtaining their desired relief on any other issue." (*Ibid.*)

The D.C. Circuit then went on to examine each of the issues raised by the petitioners and awarded fees for those on which the petitioners had obtained significant relief.[15] (*Sierra Club v. E.P.A., supra*, 769 F.2d at pp. 803–807.) In each instance, the court focused on whether the petitioners had obtained their requested relief, rather than on whether they had succeeded in persuading the court to adopt all of their arguments on a given issue. (See *id.* at p. 805 [petitioners entitled to fees although court "did not adopt wholesale the petitioners' arguments on this issue," but "granted them a good portion of the relief that they requested"]; see also *American Petroleum Institute v. U.S. E.P.A.* (D.C. Cir. 1996) 315 U.S. App.D.C. 268 [72 F.3d 907, 911–912]

---

[15] We recognize that under the fee-shifting statute at issue in *Sierra Club v. E.P.A.*, the definition of what constitutes success on an issue is somewhat different from the standard under section 1021.5. The D.C. Circuit explained that the federal Clean Air Act does not restrict awards of attorney fees to " 'prevailing' parties." (*Sierra Club v. E.P.A., supra*, 769 F.2d at p. 800.) Instead, a party need only "meet with a modicum of success on the merits." (*Ibid.*) On the other hand, the requisite success must be more than " 'trivial' or 'purely procedural.' " (*Ibid.*, quoting *Ruckelshaus v. Sierra Club* (1983) 463 U.S. 680, 688, fn. 9 [77 L.Ed.2d 938, 103 S.Ct. 3274].) This difference does not affect the validity of the court's analysis of the relation of claims in proceedings that involve judicial review of agency action based upon an administrative record.

[petitioners that successfully sought invalidation of regulation pursued single claim for relief; five bases for invalidity were only separate arguments in support of same claim]; *Kennecott Corp. v. E.P.A.* (D.C. Cir. 1986) 256 U.S. App.D.C. 218 [804 F.2d 763, 766] [no fee reduction appropriate where court vacated and remanded EPA regulation on one ground urged by petitioners but rejected alternative ground].)

We agree with the D.C. Circuit that a common administrative record and a common procedural history are not sufficient on their own to establish that claims are related. (*Goos v. National Assn. of Realtors* (D.C. Cir. 1993) 302 U.S. App.D.C. 363 [997 F.2d 1565, 1571].) Nor are multiple legal challenges to different agency decisions necessarily related because they are grounded in the standards of review prescribed by Code of Civil Procedure section 1094.5. (See *Sierra Club v. E.P.A., supra,* 769 F.2d at p. 803.) We therefore reject the contention that EPIC's challenges to the SYP, the Incidental Take Permit, the Streambed Alteration Agreement, and the EIS/EIR are related claims simply because they arise from the same administrative record. (Compare *International Center for Technology Assessment v. Vilsack* (D.D.C. 2009) 602 F.Supp.2d 228, 230, 232–233 [unsuccessful challenge to agency's decision under Plant Protection Act (7 U.S.C. § 7701 et seq.) to permit field tests of genetically engineered grass unrelated to successful challenge to permitting tests without preparation of an EIS] with *American Lands Alliance v. Norton* (D.D.C. 2007) 525 F.Supp.2d 135, 147 [all claims related where plaintiffs' sole objective was to compel U.S. Fish and Wildlife Service to list bird species as endangered].)

(b) *The Steelworkers' Case*

Applying the *Sokolow* analysis to the case before us, it is clear that the Steelworkers' action did not involve unrelated claims. The Steelworkers "petitioned for administrative mandamus to challenge *only* the SYP . . . ." (*EPIC II, supra,* 44 Cal.4th at p. 477, italics added.) Their second amended petition presented a single cause of action alleging that CDF had prejudicially abused its discretion in approving the plan. As a remedy, the Steelworkers sought a peremptory writ of mandate commanding CDF to rescind its approval of the SYP and prohibiting CDF from approving any THP that relied on the improperly approved document. The California Supreme Court agreed that CDF had prejudicially erred in failing to approve an identifiable SYP and affirmed the trial court's judgment setting aside approval of the plan and enjoining reliance on the plan after the date of the statement of decision. (*Id.* at pp. 496–497, 526–527.)

■ Thus, the Steelworkers "pursued only one claim for relief—the invalidity of the [SYP]." (*American Petroleum Institute v. U.S. E.P.A., supra*, 72 F.3d at p. 911.) They argued a number of bases for that invalidity (*ibid.*), but in the end "obtained all the *results* they sought" (*Sokolow, supra*, 213 Cal.App.3d at p. 250). There were no "important goals" of the litigation the Steelworkers failed to achieve. (*Ibid.*) In light of the result, the Supreme Court's failure to adopt some of the contentions the Steelworkers advanced in support of their claim does not require reduction of the fee award. (*Ibid.*; see *Hensley, supra*, 461 U.S. at p. 435 ["the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee"].) The Steelworkers sought an order rescinding approval of the SYP and obtained precisely that. Consequently, their action cannot be said to involve unrelated claims.

### (c) *EPIC's Case*

EPIC's case presents a more complex problem. EPIC's third amended petition sought a peremptory writ of mandate and injunctive relief to set aside four agency decisions: (1) CDF's approval of the SYP, (2) DFG's issuance of the Incidental Take Permit, (3) DFG's approval of the Streambed Alteration Agreement, and (4) CDF's and DFG's findings and certification of the EIS/EIR prepared for the three foregoing documents. (*EPIC II, supra*, 44 Cal.4th at p. 477.) EPIC contends that all of its causes of action were related, and thus all work on the lawsuit is compensable. In EPIC's view, its various challenges were "simply different legal arguments for getting to the same point: halting [the Agencies'] failure to properly regulate the Headwaters Project."

Looking at the relief EPIC ultimately obtained, it is clear that EPIC succeeded in two of its litigation objectives. Like the Steelworkers, it sought and received a judgment invalidating the approval of the SYP. Similarly, it obtained a ruling that the Incidental Take Permit was invalid "inasmuch as it included 'no surprises' clauses inconsistent with Pacific Lumber's statutory duty to fully mitigate the impacts of its incidental take." (*EPIC II, supra*, 44 Cal.4th at p. 526.) Although the California Supreme Court rejected EPIC's arguments that the Incidental Take Permit was invalid because it violated the public trust doctrine and was unsupported by adequate CESA findings (*EPIC II*, at pp. 515–517), EPIC obtained the result it sought in challenging the permit (see *Sokolow, supra*, 213 Cal.App.3d at p. 250). EPIC was therefore completely successful in achieving two of its litigation objectives, and its failure to persuade the California Supreme Court to accept all of the arguments presented in pursuit of those objectives will not necessarily bar a

fully compensatory fee award. (*Sundance, supra,* 192 Cal.App.3d at p. 274 [a court's rejection of certain alternative legal grounds is not sufficient reason for reducing fee award].)

EPIC was unsuccessful, however, in its challenges to the EIS/EIR and the Streambed Alteration Agreement. (*EPIC II, supra,* 44 Cal.4th at pp. 518–526.) It sought a writ of mandate commanding DFG to set aside its approval of the agreement and directing the Agencies to prepare an adequate EIS/EIR. It did not obtain the relief it sought with respect to these two agency actions. Thus, unlike the Steelworkers, EPIC cannot be said to have obtained all the results it sought, and it did not attain some important objectives of its litigation. (*Sokolow, supra,* 213 Cal.App.3d at p. 250.)

Nevertheless, in the unique circumstances of this case, we conclude EPIC's unsuccessful claims are related to its successful ones. The relationship among these claims becomes apparent if we review the background of the Headwaters Agreement and the administrative proceedings that gave rise to respondents' actions. The Headwaters Agreement was the subject of both federal and state legislation. (See Appropriations Act, § 501, 111 Stat. 1543, 1610; Stats. 1998, ch. 615, p. 4106.) Congress and the Legislature each made their respective monetary contributions to the agreement dependent upon the other's appropriation of the funds necessary to carry out the agreement's terms. (Appropriations Act, § 501(b)(1), 111 Stat. 1543, 1611; Stats. 1998, ch. 615, § 1, subd. (d), p. 4107.) In addition, just as Congress conditioned its funding upon the California's approval of the SYP, the Legislature conditioned California's financial contribution on the relevant federal agencies' incorporation of certain specific terms in the final HCP. (Appropriations Act, § 501(b)(2), 111 Stat. 1543, 1611 [authorization of funding effective only upon state approval of SYP]; Stats. 1998, ch. 615, § 3, subds. (a)–(k), pp. 4108–4111 [specifying terms to be included in final HCP]; *id.,* § 3(*l*)(2), p. 4111 [authorizing state funding with intent that HCP include specified conditions].)

Moreover, to satisfy both federal and state environmental policy act requirements, the federal and state agencies involved in the permitting process agreed to conduct a "joint scoping process for the preparation of environmental documents." (61 Fed.Reg. 68285 (Dec. 27, 1996).) They also announced their intention to prepare a joint EIS/EIR for all administrative actions associated with the Headwaters Agreement. (*Ibid.*) Thus, the combined EIS/EIR considered the federal incidental take permits and HCP as well as CDF's approval of the SYP, DFG's issuance of state Incidental Take Permits, and DFG's execution of the Streambed Alteration Agreement. (63 Fed.Reg. 53089 (Oct. 2, 1998).) As the United States Fish and Wildlife Service explained in its Federal Register notice, "[t]he proposed HCP, among

other things, is also intended to satisfy the requirements for a SYP under California state law and the requirements for an incidental take permit under section 2081(b) of the [CESA]." (*Id.* at pp. 53089–53090.)

The February 1999 HCP implementation agreement notes that the HCP is a component of the SYP. DFG's Incidental Take Permit incorporated the HCP, and it explained that Pacific Lumber was also obtaining a master Streambed Alteration Agreement, which itself was incorporated into the final HCP. Thus, in the words of the California Supreme Court, this case "concern[ed] a myriad of regulatory approvals, each approval supported by a document or documents that are to some degree interrelated with the others." (*EPIC II, supra,* 44 Cal.4th at p. 471; see *id.* at p. 472 [SYP and HCP "contained overlapping and interrelated analyses and provisions"].)

All of these facts combine to support our conclusion that EPIC's unsuccessful claims were related to its successful ones for purposes of the *Hensley* analysis. We thus hold that the relief EPIC sought on the unsuccessful claims did not seek to remedy a course of conduct entirely distinct and separate from the course of conduct underlying its successful claims. (*Harman I, supra,* 136 Cal.App.4th at p. 1311; see *Chavez v. City of Los Angeles, supra,* 47 Cal.4th at p. 989 [framing issue as whether claims are "factually related and closely intertwined"].)

3. Hensley *Step Two: Significance of the Overall Relief*

The Agencies also seek a reduction of the fee award based on respondents' overall lack of success on the merits. Simply stated, they contend respondents should not be compensated for the hours spent on litigating unsuccessful theories. For example, the Agencies claim the Steelworkers' contentions regarding omitted public comments were "never promising," and appellants note the California Supreme Court's statement that the "duplicative nature [of the omitted comments] essentially is not contested." (*EPIC II, supra,* 44 Cal.4th at p. 488.) They also argue that *EPIC II's* rejection of almost all of respondents' attacks on the validity of the SYP requires a reduction in the fee awards.

We leave resolution of these arguments to the trial court on remand, as they "essentially are factual matters." (*Hensley, supra,* 461 U.S. at p. 437.) On remand, the trial court may reduce the total fee awarded to the Steelworkers if it determines, in the exercise of its discretion, that the relief the Steelworkers obtained was limited in comparison to the scope of the litigation as a whole. (*Harman II, supra,* 158 Cal.App.4th at p. 418; *Sundance, supra,* 192 Cal.App.3d at p. 274; see also *American Petroleum Institute v. U.S. E.P.A., supra,* 72 F.3d at p. 912 [even if case involves a single claim, argument might

be so frivolous as to make all time spent on it unreasonable].) As to EPIC, we note that "a partially prevailing party is not necessarily entitled to all incurred fees even where the work on the successful and unsuccessful claims was overlapping." (*Mann v. Quality Old Time Service, Inc., supra*, 139 Cal.App.4th at p. 344.) The Agencies are free to ask the trial court to reduce EPIC's fee in light of EPIC's limited success by evaluating the overall relief EPIC obtained in relation to the hours reasonably expended on the litigation. (See *Harman II*, at pp. 418, 425–428.)

B. *The Trial Court Is Not Barred From Awarding EPIC's Fees for Work Performed in the Administrative Proceedings**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

C. *The Trial Court Did Not Abuse Its Discretion in Applying San Francisco Rates*

The Agencies contend the trial court abused its discretion by compensating respondents' counsel using rates charged by San Francisco attorneys rather than the lower rates charged by attorneys in Humboldt County. Appellants' argument is twofold. They first assert that to demonstrate the unavailability of local counsel, respondents should be required to establish they attempted, but failed, to find local counsel. They further assert that because "this case was shown to be a much simpler case than was imagined and pursued by EPIC and the Steelworkers," respondents cannot meet their burden of showing local counsel were either unavailable or lacked the skills necessary to litigate this case. We disagree on both counts.

█ Generally, "[t]he lodestar figure is calculated using the reasonable rate for comparable legal services in *the local community* for noncontingent litigation of the same type, multiplied by the reasonable number of hours spent on the case. [Citations.]" (*Nichols v. City of Taft* (2007) 155 Cal.App.4th 1233, 1242–1243 [66 Cal.Rptr.3d 680] (*Nichols*).) In the "unusual circumstance" that local counsel is unavailable, a trial court is within its discretion to consider out-of-town counsel's higher rates. (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 399 [33 Cal.Rptr.3d 644] (*Horsford*).) The trial court may then use those rates either in calculating the initial lodestar figure or in evaluating whether to award a multiplier to a lodestar initially based on local hourly rates. (*Nichols*, at p. 1243.)

---

*See footnote, *ante*, page 217.

The Agencies are correct that use of the higher rates for out-of-town counsel as the basis for compensation "requires a sufficient showing . . . that hiring local counsel was impracticable." (*Nichols, supra,* 155 Cal.App.4th at p. 1244.) Like the court in *Horsford,* however, "we doubt a plaintiff needs to make anything more than 'a good-faith effort to find local counsel' [citation] in order to justify the fees of out-of-town counsel . . . ." (*Horsford, supra,* 132 Cal.App.4th at p. 399.) And as EPIC points out, federal authority holds that the failure to solicit local counsel is not necessarily fatal to proving unavailability. (See *Barjon v. Dalton* (9th Cir. 1997) 132 F.3d 496, 501.) Our review of the record convinces us the trial court did not abuse its discretion in concluding respondents made the requisite showing.

In support of their motions for attorney fees, both EPIC and the Steelworkers submitted declarations by W. Timothy Needham, a local Eureka lawyer who worked on the case for EPIC. In one declaration filed in support of EPIC's motion for attorney fees, Needham stated he had participated briefly as counsel in this case, but only in "a very specific area in which specialized expertise regarding the matters at issue [was] not required." He further explained that his firm would not have undertaken "primary representation" in either EPIC's or the Steelworkers' lawsuits "because of the specialized knowledge required for their prosecution." Needham also declared he was not aware "of any other local attorney or law firm in Humboldt County who would have represented the petitioners in this matter." A number of other local attorneys submitted declarations in which they stated they would not have been willing to represent EPIC or the Steelworkers in the actions below. These declarations were "sufficient and competent evidence that [respondents] acted in good faith and hiring qualified counsel in [Humboldt County] was impracticable." (*Center for Biological Diversity v. County of San Bernardino* (2010) 188 Cal.App.4th 603, 618 [115 Cal.Rptr.3d 762].)

Thus, in this case, it appears EPIC successfully sought and found local counsel, and local counsel participated in the case for a brief period. Needham refused to undertake primary representation in this case, however, because he believed he did not possess the specialized knowledge necessary to handle it. This is therefore not a case in which "no effort was made to retain local counsel." (*Nichols, supra,* 155 Cal.App.4th at p. 1244.) Instead, from what appears in the record, local counsel were unwilling to take the cases below either because (1) they felt they lacked the necessary resources and/or expertise, (2) they already represented timber harvesters, or (3) they were reluctant to litigate against the county's largest employer, Pacific Lumber. (See *Horsford, supra,* 132 Cal.App.4th at p. 399 [recognizing that "a potential defendant [may be] too intimidating to the local bar or so replete with resources as to potentially overwhelm local counsel . . ."].) We hold this

sufficed to show that hiring local counsel was impracticable. (*Nichols*, at p. 1244.)

Finally, we expressly decline the Agencies' invitation to assess in hindsight respondents' decision to use out-of-town counsel. The Agencies cite no authority for doing so, and we are aware of none. Moreover, the Agencies' essential contention is that in the end, this case turned out to be less complex than the case "imagined" by respondents' counsel. Even if true, this would not justify subjecting respondents' decision to use San Francisco counsel to post hoc review. Respondents necessarily made the decision to engage out-of-town counsel at the outset of these proceedings. It would be unfair to expect them to make completely accurate predictions about the ultimate outcome of the case at its inception, and we refuse to impose such a duty on them.

D.–F.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV. *Conclusion*

We hold that the outcome of the appellate proceedings in this case requires a reevaluation of the attorney fee awards, and we therefore reverse the orders awarding attorney fees and remand for the trial court to exercise its discretion in light of the outcome of the merits appeals. (See *Ventas Finance I, LLC v. Franchise Tax Bd.* (2008) 165 Cal.App.4th 1207, 1235 [81 Cal.Rptr.3d 823].) On the question of respondents' entitlement to a fee award, we conclude that respondents' litigation conferred a significant benefit on the general public or a large class of persons. (§ 1021.5, subd. (a).) We remand to the trial court to determine whether the litigation was necessary, taking into account the question of prelitigation settlement efforts. (§ 1021.5, subd. (b); *Vasquez, supra*, 45 Cal.4th at pp. 258–259.) If the trial court determines respondents' actions were necessary, then it may calculate appropriate fee awards in accordance with the principles set forth in part III. of this opinion after considering all relevant factors, including respondents' limited success.[20] (See *Harman I, supra*, 136 Cal.App.4th at pp. 1316–1317.)

---

[*]See footnote, *ante*, page 217.

[20] Our resolution of these appeals renders the parties' motions for production of additional evidence on appeal and requests for judicial notice moot. They are denied on that basis. The Agencies also make a cursory argument that respondents have already been paid a sufficient fee from Pacific Lumber's bankruptcy case, but because this argument is based on materials for which the Agencies seek judicial notice, we do not consider it. To the extent any of the materials attached to the parties' motions are relevant to the issues to be decided on remand, the parties may request that the trial court consider them.

## DISPOSITION

The postjudgment orders awarding attorney fees are reversed, and the matter is remanded with directions that the trial court redetermine whether respondents' actions were necessary within the meaning of section 1021.5 and the amount of any reasonable fee award. The parties shall bear their own costs on appeal.

Jones, P. J., and Needham, J., concurred.

A petition for a rehearing was denied December 15, 2010, and the opinion was modified to read as printed above.