Filed 10/6/15  Habitat and Watershed Caretakers v. City of Santa Cruz CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| HABITAT AND WATERSHED CARETAKERS,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CITY OF SANTA CRUZ et al.,<br><br>Defendants and Appellants. | H040762<br>(Santa Cruz County<br>Super. Ct. No. CV168697) |

Appellant Habitat and Watershed Caretakers (Habitat) appeals from the trial court's order granting it $250,000 in attorney's fees under Code of Civil Procedure section 1021.5.[1]  Respondents City of Santa Cruz (the City) and Regents of the University of California (the Regents) cross-appeal from the trial court's order.  The City and the Regents challenge the trial court's calculation of the lodestar, and Habitat challenges the court's application of a negative multiplier to its fees on the merits and a "downward adjustment" to its fees for the fee litigation.  We reject the challenges to the lodestar, but we conclude that the trial court abused its discretion in connection with the

---

[1]      Subsequent statutory references are to the Code of Civil Procedure unless otherwise specified.

negative multiplier and the downward adjustment. Consequently, we reverse the order and remand for further proceedings.

## I. Background

The City certified an environmental impact report (EIR) for a project to seek an amendment of the City's sphere of influence (SOI) to include an undeveloped portion of the University of California, Santa Cruz (UCSC) campus known as "North Campus." The purpose of the amendment of the City's SOI was to permit the City to provide extraterritorial water and sewer services to proposed new development in North Campus. The draft EIR found one significant and unavoidable direct impact: " 'The proposed project would result in future provision of water service to the North Campus portion of the UCSC campus that would support new planned development and growth to the year 2020. There are inadequate water supplies to serve the project under existing and future multiple dry year (drought) conditions.' " (*Habitat & Watershed Caretakers v. City of Santa Cruz* (2013) 213 Cal.App.4th 1277, 1285 (*Habitat I*).) In other words, the City lacked the water supply necessary to provide the service that the project proposed.

Habitat filed a mandate petition contending that the City had failed to comply with the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.). Habitat argued that the EIR did not adequately discuss and analyze the impacts of the project on water supply, watershed resources, biological resources, and indirect growth, misdescribed the project's objectives, failed to consider and analyze a reasonable range of alternatives, and failed to provide adequate mitigation measures. Habitat also asserted that the City failed to make sufficient findings and failed to provide an adequate statement of overriding considerations. (*Habitat I*, *supra*, 213 Cal.App.4th at pp. 1283-1286.)

The trial court denied Habitat's petition. (*Habitat I*, *supra*, 213 Cal.App.4th at p. 1286.) On appeal, this court found that the City's EIR was inadequate because the EIR

2

failed to discuss *any* feasible alternative, such as a limited-water alternative, that could avoid or lessen the significant environmental impact of the project on the City's water supply. This court rejected Habitat's other contentions. On remand, the trial court was directed to vacate its decision and to enter a new judgment granting Habitat's petition and directing the City to vacate its certification of the final EIR and approval of the project. (*Habitat I*, at pp. 1308-1309.)

## II. Habitat's Fees Motion

On remand, Habitat filed a motion seeking its attorney's fees under section 1021.5. Habitat sought a total of $486,800 in fees for 837.3 hours of attorney time for its litigation of the merits at hourly rates ranging from $300 per hour to $750 per hour. For the fees litigation, Habitat sought compensation for 131.8 hours of attorney time. Attorney Stephan C. Volker, Habitat's lead attorney, had spent 389.5 hours on the merits and 58.6 hours on the fees litigation, and Habitat sought a rate of $750 per hour for Volker's time. The remainder of the attorney time had been spent by his associates, who had lower billing rates ranging from $300 to $500 per hour, with the bulk of their hours being charged at $350 per hour.[2] Habitat submitted detailed billing records itemizing each task that had been performed by its attorneys since they had been engaged by Habitat in 2008.

Don Stevens, Habitat's president, described Habitat's search for counsel to handle this case. Habitat interviewed attorneys both in Santa Cruz County and elsewhere. Volker, who was based in Oakland, was particularly knowledgeable about the issues in this case because he had represented a party in previous litigation about UCSC's long

---

[2] The time of a "law graduate" working on the fees litigation was billed at $150 per hour.

3

range development plan, which had resulted in the settlement agreement that was at issue in *Habitat I*. (*Habitat I*, *supra*, 213 Cal.App.4th at p. 1284.) None of the local attorneys "had as much experience and appellate success" as Volker. Habitat, which could not afford to proceed with the litigation without a partially contingent fee arrangement, discovered that local environmental attorneys were not willing to represent it on a contingent fee basis. Volker, on the other hand, was the only qualified environmental attorney willing to take the case "on a largely contingent fee basis." Habitat knew that the City and the Regents were using "high-powered legal firms from outside the local area" and wanted to be able to "counter balance these legal heavy-weights." Habitat's "fee arrangement" with Volker was that Habitat would pay "a flat monthly rate of $3,000.00 for trial work up to a cap of $36,000.00, and a monthly rate of $3,000 for appellate work up to a cap of $25,000.00, plus reimbursement of expenses." Habitat ultimately paid Volker $61,000 in fees, reimbursed Volker for expenses, and paid Volker an additional $5,000 for "services in the California Supreme Court."

Volker submitted the declaration of Richard M. Pearl, an expert on attorney's fees issues, to demonstrate that Volker's requested $750 hourly rate and the rates for his associates were consistent with "the market rates for attorneys of comparable skill and experience in the San Francisco Bay Area." Pearl declared that the requested hourly rates "are well in line with the non-contingent market rates charged for reasonably similar services by San Francisco Bay Area attorneys of reasonably similar qualifications and experience." Pearl's expert opinion was based in part on rates that courts had approved as reasonable when sought by San Francisco Bay Area attorneys. These rates equaled or exceeded the levels sought by Volker. Pearl also relied on detailed recent published surveys of legal rates showing that the rates sought by Volker were "well within the range of rates" charged by San Francisco attorneys. In addition, he founded his opinion on information about billing rates charged by California law firms, which were consistent with the rates requested by Volker for attorneys with similar levels of experience. Pearl

4

had reviewed Volker's billing records and concluded that the time spent by Volker and his associates had "been efficiently spent," "reasonably calculated to avoid duplication of effort and to maximize efficiency," and "represent[ed] a reasonable number of hours for litigating this matter."

Volker also submitted his own declaration and relied on Pearl's declaration to support his request for a multiplier of 2.0 due to the "high contingent risk" and the low amount paid by Habitat. Volker explained that this litigation faced "a very substantial risk" that it would be "unsuccessful." "Unless the compensation in those cases that are won is greater than actual market rates, the financial losses in those cases that are not won would outweigh the compensation recovered when litigation is successful" thereby making it "financially infeasible" for an attorney to accept a public interest action such as this one. Pearl explained that "[a]ttorneys who litigate on a wholly or partially contingent basis expect to receive significantly higher effective hourly rates in cases where compensation is contingent on success, particularly in hard-fought cases where, like the case at bar, the result is uncertain." Pearl opined that "a contingent case with at least a 50% chance of not prevailing should recover a fee that is at least twice the lodestar as compensation for the attorney's risk and loan of services."

### III.  Opposition To Habitat's Fees Motion

The City and the Regents claimed that the amount sought by Habitat should be reduced because (1) the "out-of-market" rates were unreasonable, (2) the number of hours was inflated and excessive, (3) a positive multiplier was unwarranted, and (4) if the court awarded the requested lodestar, it should apply a negative multiplier of 0.5. The City and the Regents asked the court to *either* reduce the lodestar by one-half *or* apply a negative multiplier of 0.5.

They claimed that Habitat had not justified its decision to hire non-local counsel "at an out-of-market rate typical of the San Francisco Bay area." The City and the

5

Regents pointed out that their own attorneys' billing rates did not exceed $425 per hour. They complained that the billing rates relied on by Pearl did not involve CEQA litigation "or similar work" and were not limited to San Francisco attorneys. The City and the Regents submitted evidence that local Santa Cruz area rates for CEQA attorneys did not exceed $425 per hour.

The City and the Regents argued that the number of hours spent by Habitat's attorneys was "unreasonable," "inflated[,] and improper" because too much time had been spent preparing the administrative record, Habitat's opening appellate brief, and Habitat's answer to one of the petitions for rehearing filed by the City and the Regents. The City and the Regents submitted their attorney's declaration that the administrative record tasks could have been completed by paralegals or legal secretaries and that the briefs should not have taken that long to prepare.

The City and the Regents contended that a positive multiplier was unwarranted because the contingent risk factor was already accounted for in the hourly rates that Habitat was seeking as part of the lodestar, and the "fee arrangement" between Habitat and Volker already mitigated the risk. They also argued that the fact that the fees would be paid by public entities weighed against a multiplier. The City and the Regents made an explicitly "alternative" argument that a negative multiplier should be applied if the court awarded Habitat its requested lodestar. The City and the Regents based this argument primarily on Habitat's limited success, the burden of the award on taxpayers, and mitigation of the contingent risk.

### IV. The Trial Court's Ruling

The motion was not heard by the original trial judge because that judge had been disqualified. The trial court awarded Habitat "its requested lodestar" but made a "downward adjustment by half to reflect [Habitat's] partial success in litigation." The court found that the issues on which Habitat was unsuccessful "were directly related to

6

the claim on which it was successful," but the result achieved was "a 50 percent success." The court found that there was a lack of local counsel to represent Habitat, that the hours spent by Habitat's counsel were reasonable, and that the hourly rates requested by Habitat's counsel were reasonable in light of the fact that local counsel was unavailable and that Habitat's counsel took the case on a contingency fee basis. Because it utilized the contingent risk factor in setting the lodestar, the court did not consider it again in deciding the multiplier issue. The court found that a "negative multiplier" was appropriate due to Habitat's "50 percent rate of success." The court's use of the negative multiplier yielded an attorney's fees award of $226,725 for litigation of the merits. With regard to fees for the fees litigation, the court reduced this amount by 60 percent to $22,199.70 because the City and the Regents "did not create any extraordinary difficulties in this case . . . ."[3] Habitat timely filed a notice of appeal from the court's order, and the City and the Regents filed a notice of cross-appeal.

## V. Discussion

The City and the Regents do not dispute Habitat's *entitlement* to attorney's fees under section 1021.5. The parties' challenges to the trial court's order focus on the *amount* of fees that Habitat was entitled to recover, with the City and the Regents challenging the court's calculation of the lodestar, and Habitat challenging the court's utilization of a negative multiplier or "downward adjustment."

---

[3] The court awarded $1,075.30 for Habitat's attorney's appearance at the hearing on the fees motion but denied Habitat's request for attorney's fees for its attorney's preparation for and travel to the hearing on the fees motion. The court's ruling reduced this portion of Habitat's attorney's fees request for the fees litigation from $3,720 to $1,075.30. None of the parties questions this ruling on appeal.

"Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any." (§ 1021.5.)

"[A] court assessing attorney fees begins with a touchstone or lodestar figure, based on the 'careful compilation of the time spent and reasonable hourly compensation of each attorney . . . involved in the presentation of the case.' [Citation.] . . . In referring to '*reasonable*' compensation, we indicated that trial courts must carefully review attorney documentation of hours expended; 'padding' in the form of inefficient or duplicative efforts is not subject to compensation. [Citation.] [¶] . . . [T]he lodestar is the basic fee for comparable legal services in the community; it may be adjusted by the court based on factors including . . . the contingent nature of the fee award. [Citation.] The purpose of such adjustment is to fix a fee at the fair market value for the particular action. In effect, the court determines, retrospectively, whether the litigation involved a contingent risk or required extraordinary legal skill justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services." (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1131-1133 (*Ketchum*).)

"The amount of fees under . . . section 1021.5 is classically tested under the abuse of discretion standard." (*Jaramillo v. County of Orange* (2011) 200 Cal.App.4th 811, 830.) "The ' "experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it

8

will not be disturbed unless the appellate court is convinced that it is clearly wrong."'"[4] (*Ketchum*, *supra*, 24 Cal.4th at p. 1132.) "[W]hile a trial court has discretion to determine the proper amount of an award, the resulting fee must still bear some reasonable relationship to the lodestar figure and to the purpose of the private attorney general doctrine." (*Press v. Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 324.)

## A.  Cross-appeal:  Lodestar Calculation

The City and the Regents argue that the court abused its discretion in calculating the lodestar.

The City and the Regents appear to possibly be arguing that the trial court's calculation of the lodestar was an abuse of discretion because Habitat achieved only "partial success." They cite no authority for the proposition that the trial court was obligated to consider Habitat's alleged "partial success" in the calculation of the lodestar where it was utilizing that factor in determining the multiplier. A court is obviously not required to double-count "partial success" against a party. (*Environmental Protection Information Center v. Department of Forestry & Fire Protection* (2010) 190 Cal.App.4th 217, 239 (*EPIC*).) The fact that a successful party has achieved only a partial success does have a role to play in determining the amount of fees to be awarded. However, that role is limited to either the apportionment of hours between successful claims and

---

[4]     The judge who ruled on the fees motion was not the judge who presided over the merits litigation.  There is some authority indicating that this circumstance impacts our standard of review.  "[W]hen, as here, the fee order under review was rendered by a judge other than the trial judge, we may exercise ' "somewhat more latitude in determining whether there has been an abuse of discretion than would be true in the usual case." ' [Citation.]" (*Center For Biological Diversity v. County of San Bernardino* (2010) 188 Cal.App.4th 603, 616.)  We find no need to decide in this case whether a modified abuse of discretion standard of review is appropriate since we would reach the same conclusions regardless.

unsuccessful claims or the application of a negative multiplier. Here, the trial court found that the successful and unsuccessful contentions in this case were related and declined to apportion hours between those claims. The City and the Regents do not explicitly challenge that finding in their cross-appeal. While "partial success" may play a role in limiting the number of hours attributable to a party's success *or* in supporting application of a negative multiplier, a trial court is not obligated to utilize "partial success" in *either* decision and certainly not in *both*. Here, the trial court found that all of the hours spent were reasonably necessary, which precluded a finding that hours spent on unsuccessful contentions were not compensable.

We proceed to the challenges made by the City and the Regents to the trial court's lodestar calculation. Two findings are necessary in order to calculate the lodestar. The court must determine the number of hours that the attorneys have spent on the litigation, not including hours expended on "inefficient or duplicative efforts," which are excluded because attorneys are entitled to only "'*reasonable'* compensation." (*Ketchum*, *supra*, 24 Cal.4th at p. 1132.) And the court must ascertain the "'reasonable hourly compensation of each attorney . . . involved in the presentation of the case.'" (*Ketchum*, *supra*, 24 Cal.4th at pp. 1132-1132.)

### 1. Number of Hours

The City and the Regents claim that the trial court abused its discretion by basing the lodestar on the number of hours claimed by Habitat's attorneys because those hours were "inflated and improper."

"A trial court may not rubber stamp a request for attorney fees, but must determine the number of hours *reasonably* expended. '"California courts have consistently held that a computation of time spent on a case and the reasonable value of that time is fundamental to a determination of an appropriate attorneys' fee award."' [Citation.] 'The evidence should allow the court to consider whether the case was overstaffed, how

10

much time the attorneys spent on particular claims, and whether the hours were reasonably expended.'" (*Donahue v. Donahue* (2010) 182 Cal.App.4th 259, 271.)

The City and the Regents contend that the trial court "rubber stamped" and failed to evaluate the reasonableness of the number of hours claimed by Habitat's attorneys. The record does not support this contention. The court's statements at the hearing on the attorney's fees motion plainly acknowledged that the lodestar was limited to "the reasonable number of hours spent on the case." Although the trial court expressed reluctance to "second-guess these hours [claimed by Habitat's attorneys]," the court nevertheless accepted its duty to evaluate the reasonableness of the claimed hours in response to the claims by the City and the Regents that Habitat's attorneys had "inappropriately spent" attorney time on various tasks. The court expressly found that Habitat's attorneys had "sufficiently detailed the need for the hours spent" in their declarations. Since this finding reflects that the trial court appropriately scrutinized the need for the hours devoted to the litigation by Habitat's attorneys, we reject the claim that the court abandoned its responsibility to evaluate the reasonableness of the claimed hours.

The City and the Regents put misplaced reliance on *Thayer v. Wells Fargo Bank* (2001) 92 Cal.App.4th 819 (*Thayer*). In *Thayer*, the bank did not challenge the court's calculation of the lodestar but instead argued that the court should have applied a negative multiplier, rather than a multiplier that doubled the lodestar. The attorney in *Thayer* had been one of many attorneys in several coordinated actions that were settled by the bank almost immediately after they were filed. Much of the time spent by the attorney in *Thayer* was needless duplication of time spent by the other attorneys in the action. (*Thayer*, at pp. 833-834, 840-841.) The First District Court of Appeal held that the duplication of time merited a negative multiplier or a reduction in the number of hours and remanded the case to the trial court for a "fuller factual inquiry . . . ." (*Thayer*, at p. 844.) None of the circumstances present in *Thayer* are present here. The City and

11

the Regents vigorously fought Habitat's action on the merits both in the trial court and on appeal. There were no coordinated actions, and the City and the Regents do not claim that Habitat's attorneys duplicated the efforts of other attorneys.

The City and the Regents complain in some detail that Habitat's attorneys devoted too much time to the preparation of the administrative record, spent an unreasonable amount of time on "vague, non-descript" tasks "such as 'file review,'" and spent too much time preparing Habitat's appellate briefing. The record contains detailed billing statements describing the tasks performed by Habitat's attorneys and declarations that support the need for the hours spent on these tasks. The trial court found that Habitat had demonstrated the need for the hours spent by its attorneys on this litigation. As the City and the Regents acknowledge, the trial court's ruling is entitled to deference. We decline their invitation to engage in what would amount to a de novo reassessment of the reasonableness of the number of hours spent by Habitat's attorneys on each task. That assessment was for the trial court, and our review is solely for abuse of discretion. As the record contains substantial support for the trial court's finding that the number of hours Habitat's attorneys devoted to this litigation was reasonably necessary, we find no abuse of discretion.

## 2. Hourly Rates

The City and the Regents argue that the trial court abused its discretion "by failing to determine reasonable hourly rates" for Habitat's attorneys. (Boldface omitted.) They essentially assert that the trial court should not have credited the evidence submitted by Habitat regarding the reasonableness of the requested rates and instead should have credited evidence submitted by the City and the Regents that they believe showed that the requested rates were "significantly inflated . . . ."

"[T]he '"reasonable hourly rate [used to calculate the lodestar] is the product of a multiplicity of factors . . . the level of skill necessary, time limitations, the amount to be obtained in the litigation, the attorney's reputation, and the undesirability of the case."'"

12

(*Ketchum*, *supra*, 24 Cal.4th at p. 1139.) "'The purpose of statutory attorney fee provisions is to provide financial incentives necessary for the private enforcement of important civil rights. [Citation.] If a potential defendant is too intimidating to the local bar or so replete with resources as to potentially overwhelm local counsel, or if the local plaintiffs' bar has not the resources to engage in complex litigation on a contingency-fee basis, the public interest in the prosecution of meritorious . . . cases requires that the financial incentives be adjusted to attract attorneys who are sufficient to the cause.'" (*Center For Biological Diversity v. County of San Bernardino*, *supra*, 188 Cal.App.4th at pp. 616-617.) When it is necessary for a plaintiff to engage non-local counsel, the trial court must consider the attorney's "home market rate" rather than simply the local market rate for counsel. (*Id.* at p. 619.)

Habitat submitted evidence that it could not afford to pursue this case except on a contingent or partially contingent fee basis. Habitat tried to find local counsel to handle this litigation, but no other environmental attorney except Volker, who is based in Oakland, was willing to take the case on a contingent or partially contingent basis. Volker was highly experienced, particularly knowledgeable about the issues in this case, and had a history of success in environmental cases. Habitat sought a rate of $750 per hour for Volker's time, and rates from $300 to $500 for his associates' time, with the bulk of the associates' hours being charged at $350 per hour. While these rates exceeded local market rates, Habitat submitted evidence that the requested rates were within the range of market rates for attorneys of comparable experience in the San Francisco Bay Area. The trial court expressly found that the hourly rates requested by Habitat's counsel were reasonable in light of the fact that local counsel was unavailable and that Habitat's counsel took the case on a contingency fee basis.

The City and the Regents do not directly challenge the trial court's finding that Habitat was entitled to out-of-market rates due to the unavailability of local counsel. They claim that the court abused its discretion by finding Volker's $750 per hour rate

13

reasonable because the evidence submitted by Habitat of the market rates in the San Francisco Bay Area was not limited to "environmental attorneys" and Volker submitted no evidence that he had ever charged or been awarded fees at a rate of $750 per hour.[5]

A court must take many factors into account in determining the reasonable hourly rate for lodestar purposes. (*Ketchum*, *supra*, 24 Cal.4th at p. 1139.) The reasonable hourly rate must be sufficient "'to provide financial incentives necessary for the private enforcement of important civil rights.'" (*Center For Biological Diversity v. County of San Bernardino*, *supra*, 188 Cal.App.4th at p. 617.) A trial court may make a "contingency adjustment" either as part of the lodestar calculation "or by applying a multiplier to the noncontingency lodestar calculation (but not both)." (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 395 (*Horsford*).) Here, the trial court chose to apply a "contingency adjustment" to the hourly rate, rather than utilizing such an adjustment as part of its multiplier decision.

"'"[A] contingent fee contract, since it involves a gamble on the result, may properly provide for a larger compensation than would otherwise be reasonable."'" The purpose of a fee enhancement, or so-called multiplier, for contingent risk is to bring the financial incentives for attorneys . . . into line with incentives they have to undertake claims for which they are paid on a fee-for-services basis. [¶] The economic rationale for fee enhancement in contingency cases has been explained as follows: 'A contingent fee must be higher than a fee for the same legal services paid as they are performed. The contingent fee compensates the lawyer not only for the legal services he renders but for the loan of those services. The implicit interest rate on such a loan is higher because the

---

[5]    The City and the Regents challenge all of the rates requested by Habitat and accepted by the court, but the focus of their argument is Volker's rate of $750 per hour. As they devote little attention to the lower rates requested for his associates, we see no need to address those lower rates separately.

14

risk of default (the loss of the case, which cancels the debt of the client to the lawyer) is much higher than that of conventional loans.' [Citation.] 'A lawyer who both bears the risk of not being paid and provides legal services is not receiving the fair market value of his work if he is paid only for the second of these functions. If he is paid no more, competent counsel will be reluctant to accept fee award cases.' [Citations.] [¶] Such fee enhancements are intended to compensate for the risk of loss generally in contingency cases *as a class*." (*Ketchum*, *supra*, 24 Cal.4th at pp. 1131-1133.)

Habitat produced evidence that the contingent risk factor was applicable here. By taking on difficult cases such as this one that do not have high prospects for success and are accepted on a contingent or partially contingent basis, Volker takes a substantial risk that attorneys compensated on a fee-for-service basis do not. Unless a public interest attorney like Volker has the prospect of obtaining a higher hourly rate than a similarly experienced attorney being paid by a client would charge, he will inevitably be financially unsuccessful. This is true, as Volker and Pearl explained, because many such high risk cases will be unsuccessful and will result in a loss for the attorney. The evidence presented by Habitat supported the trial court's decision to make a "contingency adjustment" in determining the reasonable hourly rate for Habitat's attorneys.

The City and the Regents do not directly challenge the trial court's decision to apply a contingency adjustment in setting the reasonable hourly rate for Habitat's attorneys. Instead, they essentially ignore the fact that the court made such an adjustment. The City and the Regents claim that the hourly rates sought by Habitat were excessive because they exceeded the rates charged by land use attorneys like their own. This claim ignores the fact that attorneys who *defend clients against* public interest litigation do not do so on a contingency fee basis. Their clients can be relied upon to pay the attorneys for their work and to pay those fees as they are incurred. Attorneys who take on public interest litigation on a contingent fee basis, on the other hand, lack the certainty of payment and, even when they succeed in obtaining recompense, they often

15

have to wait for years until the conclusion of the litigation to obtain any fees for their efforts. The purpose of section 1021.5 is to provide an adequate financial incentive to encourage such attorneys to take on such litigation. No valid comparison can be made between public interest attorneys who work on a contingent fee basis and land use defense attorneys who can expect timely recompense for all of their work regardless of the outcome of the litigation.

The City and the Regents also argue that the trial court abused its discretion in failing to limit the relevant comparators to land use, environmental, and CEQA attorneys. The trial court had discretion to determine the relevant comparators. While Volker's $750 rate was high, it was not outside the range for attorneys with his level of experience in the San Francisco Bay Area, and the same was true for the rates sought for his associates. More fundamentally, the trial court's approval of the rates sought by Habitat incorporated a "contingency adjustment" to the market rates for attorneys with similar levels of experience that could properly elevate the approved rates over those market rates. It was not necessary for Habitat to demonstrate that Volker had ever received $750 per hour. The relevant consideration was the market rate for attorneys of his caliber and experience and the appropriate "contingency adjustment" to make to that market rate. The City and the Regents have failed to show that the trial court's determination of the market rate and application of a contingency adjustment failed to produce a reasonable hourly rate for Volker's services. Accordingly, they have not showed that the trial court's acceptance of Habitat's requested rates was an abuse of discretion.

## B. Habitat's Appeal: Multiplier and Fees For Fees Litigation

Habitat claims that the trial court's use of a negative multiplier was an abuse of discretion because the court failed to account for the contingent risk factor and

16

improperly based the negative multiplier on Habitat's partial success. Habitat also complains that the court should not have reduced its fees for the fees litigation.[6]

## 1. Standard of Review

Habitat claims that we owe no deference to the trial court because Habitat prevailed *on appeal*, not in the trial court. Habitat's reliance on *EPIC* to support this proposition is misplaced because the issue in *EPIC* to which a different standard of review was applied did not concern the *amount* of attorney's fees but *entitlement* to attorney's fees after a party prevailed on appeal. (*EPIC*, *supra*, 190 Cal.App.4th at pp. 229-230; see also *Samantha C. v. State Dept. of Developmental Services* (2012) 207 Cal.App.4th 71, 78.) While an appellate court may be in the best position to judge whether a party has satisfied the criteria in section 1021.5 by prevailing on appeal, the determination of the *amount* of attorney's fees to which a party is entitled depends on

---

[6]     Habitat's opening brief states that it raises "three issues," which it identifies as (1) the court's application of a negative multiplier based on partial success, (2) the court's reduction of fees for the fees litigation, and (3) the court's failure to take into account the contingent risk factor in setting the multiplier. However, the opening brief also contains a section in which Habitat appears to contend that the trial court abused its discretion by failing to find that a positive multiplier was merited based on the complexity of the issues, the difficulty of the case, and the "public service" interest served by the litigation.

A trial court is not obligated to apply a positive multiplier; the multiplier decision is discretionary. (*Ketchum*, *supra*, 24 Cal.4th at pp. 1138-1139.) Because we remand this matter for the court to reconsider its multiplier decision, we need not address Habitat's claim that the court abused its discretion in failing to apply a positive multiplier. However, we note that the trial court explicitly rejected Habitat's claim that this case "involve[d] unusually novel issues or require[d] an extraordinary degree of skill." In light of the fact that Habitat's attorneys were experienced CEQA litigators, the trial court could reasonably conclude that the CEQA issues raised in this case were not so difficult as to merit a positive multiplier. And because section 1021.5 authorizes fees only for public interest litigation, the public service interest promoted by this litigation did not so distinguish this case from other public interest litigation as to require application of a positive multiplier.

17

numerous factual issues that are properly determined by a trial court, rather than an appellate court. Indeed, in *EPIC*, the Court of Appeal remanded for the trial court to determine issues related to the amount of fees, including the level of success. "We leave resolution of these arguments to the trial court on remand, as they 'essentially are factual matters.' [Citation.]" (*EPIC*, at p. 247.) Since the trial court made the factual determinations related to the amount of fees, we give the trial court the deference that we normally afford the factfinder.

## 2. Consideration of Contingent Risk Factor

Habitat contends that the trial court failed to consider in setting the multiplier the contingent risk that its attorneys faced in taking this case on a contingent fee basis. We find no error. This is not a case in which the trial court failed to fashion an attorney's fees award that took into account the contingent risk factor. The trial court applied a "contingency adjustment" in determining the reasonable hourly rates for Habitat's attorneys. The contingent risk factor may be adjusted for either as part of the lodestar calculation (here in determining the hourly rate) or in determining the multiplier, "(but not both)." (*Horsford*, *supra*, 132 Cal.App.4th at p. 395.)

The contingent risk factor, like some of the other factors relevant to the multiplier, may be accounted for in determining the lodestar and therefore should not be double-counted in determining the multiplier. "Of course, the trial court is not *required* to include a fee enhancement to the basic lodestar figure for contingent risk, exceptional skill, or other factors, although it retains discretion to do so in the appropriate case; moreover, the party seeking a fee enhancement bears the burden of proof. . . . We emphasize that when determining the appropriate enhancement, a trial court should not consider these factors to the extent they are already encompassed within the lodestar. The factor of extraordinary skill, in particular, appears susceptible to improper double counting; for the most part, the difficulty of a legal question and the quality of representation are already encompassed in the lodestar. . . . Thus, a trial court should

award a multiplier for exceptional representation only when the quality of representation far exceeds the quality of representation that would have been provided by an attorney of comparable skill and experience billing at the hourly rate used in the lodestar calculation. Otherwise, the fee award will result in unfair double counting and be unreasonable." (*Ketchum*, *supra*, 24 Cal.4th at pp. 1138-1139.)

The trial court's decision to account for the contingent risk in setting reasonable hourly rates instead of in setting the multiplier was not an abuse of discretion since the contingent risk factor should not be "double count[ed]."

### 3. Application of Negative Multiplier Based on Partial Success

Habitat argues that the trial court abused its discretion in applying a negative multiplier based on "partial success" because Habitat succeeded on all of its "claims," its "unsuccessful theories" were related to its successful claims, and it obtained all the relief it sought.

"Although fees are not reduced when a plaintiff prevails on only one of several factually related and closely intertwined claims [citation], 'under state law as well as federal law, a reduced fee award is appropriate when a claimant achieves only limited success' [citations]." (*Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 989-990.) "California courts applying section 1021.5 in cases of limited success have adopted the approach set forth in *Hensley v. Eckerhart* (1983) 461 U.S. 424, 434 [76 L.Ed.2d 40, 103 S.Ct. 1933] (*Hensley*). . . . [¶] In cases of limited success, *Hensley* establishes a two-part inquiry. [Citation.] The first step asks whether 'the plaintiff fail[ed] to prevail on claims that were unrelated to the claims on which he succeeded[.]' [Citations.] In the first step of the *Hensley* inquiry, charges included in the initial lodestar calculation are 'subject to challenge . . . as being unrelated to the plaintiff's successful claims.' [Citation.] Thus, this step requires a court to examine whether the prevailing party's unsuccessful claims are related to its successful ones. . . . [¶] If successful and unsuccessful claims are *related,* the court proceeds to the second step of *Hensley* inquiry, which asks whether 'the

19

plaintiff achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award.' (*Hensley, supra,* 461 U.S. at p. 434.) In this step, the court will 'evaluate the "significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation."' [Citation.] Full compensation may be appropriate where the plaintiff has obtained 'excellent results,' but may be excessive if 'a plaintiff has achieved only partial or limited success.' (*Hensley,* at pp. 435, 436.) 'The court may appropriately reduce the lodestar calculation "if the relief, however significant, is limited in comparison to the scope of the litigation as a whole."' [Citation.]" (*EPIC*, *supra*, 190 Cal.App.4th 217, 238-239.)

"Courts have discretion to compensate a partially successful plaintiff for time spent on unsuccessful legal theories, provided such time was reasonably incurred. [Citation.] But a reduction in the fee award may be appropriate where a plaintiff has failed to succeed on some of its claims. [Citation.] The distinction between theories and claims is not always clear. As a general rule, however, California courts have tended to distinguish theories and claims by comparing the goals or objectives of the plaintiff's litigation with the relief ultimately obtained. [Citation.] The rule might aptly be summarized as follows: 'success counts and is to be judged . . . by the relief given or the right established.'" (*EPIC*, *supra*, 190 Cal.App.4th at p. 240.) "[T]he fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. [Citation.] Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters." (*Hensley v. Eckerhart* (1983) 461 U.S. 424, 435 (*Hensley*).) "Where plaintiffs are entirely successful on all their claims for relief, it is not important that some of the legal theories used to support those claims were not found meritorious, so long as the plaintiffs did prevail." (*Sokolow v. County of San Mateo* (1989) 213 Cal.App.3d 231, 250 (*Sokolow*).)

The trial court found that Habitat had achieved only a partial success even though its unsuccessful contentions were related to its successful contention. In its statement of decision, the trial court relied on three cases: *Karuk Tribe of Northern California v. California Regional Water Quality Control Bd., North Coast Region* (2010) 183 Cal.App.4th 330 (*Karuk*), *Pellegrino v. Robert Half Internat., Inc.* (2010) 182 Cal.App.4th 278 (*Pellegrino*), and *EPIC*. Its heavy reliance on *Karuk* to support its decision to apply a negative multiplier based on "partial success" was misplaced.[7] *Karuk* did not involve the application of a negative multiplier based on "partial success." The plaintiffs in *Karuk* were awarded fees under section 1021.5 by the trial court. (*Karuk*, at p. 341.) The Court of Appeal found that the plaintiffs were not *entitled* to *any* section 1021.5 fees because, having failed to obtain *any* of the relief they sought, the plaintiffs could not qualify under section 1021.5 as a "successful party." (*Karuk*, at pp. 362-363, 366.) Since *Karuk* was an entitlement case, rather than a case concerning the amount of fees, it was not relevant to a "partial success" determination.

*Pellegrino* also was not relevant to a "partial success" determination. It was an action for Labor Code violations and unfair competition, with the unfair competition

---

[7] The court's statement of decision rather than its oral comments at the hearing constitute its reasoning for purposes of our review. " 'The statement of decision provides the trial court's reasoning on disputed issues and is our touchstone to determine whether or not the trial court's decision is supported by the facts and the law.' [Citation.] . . . [¶] There are instances in which a court's oral comments may be valuable in illustrating the trial judge's theory, but they may never be used to impeach the order or judgment on appeal." (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 268.) At the hearing, the court observed that "the City and the Regents have a compelling argument that a recirculation of the EIR may result in no change" to the project. "Obviously, there will be significant work to be done on all sides with the new EIR that may change the result, although that is not a guarantee or as strong as Habitat would claim it to be . . . ." The court's statement of decision included no statements regarding the potential impact of a new EIR on the project.

cause of action based solely on the Labor Code violations. The plaintiffs prevailed and sought attorney's fees. Attorney's fees were authorized only for the Labor Code violations, not for the unfair competition cause of action. The trial court reduced the lodestar by 15 percent to account for attorney's fees attributable to the unfair competition cause of action and applied a 1.75 multiplier to the reduced fees. The defendants challenged the attorney's fees award on appeal, claiming that the lodestar should have been further reduced and no multiplier should have been applied. (*Pellegrino*, *supra*, 182 Cal.App.4th at pp. 282-283, 286-287.) The Court of Appeal found no abuse of discretion in the court's reduction of the lodestar to account for the unfair competition cause of action for which attorney's fees were unavailable or in its use of a 1.75 multiplier based on the novelty and complexity of the issues. (*Pellegrino*, at pp. 288-292.) Unlike *Pellegrino*, this case did not involve a cause of action for which attorney's fees were unavailable. Hence, the opinion in *Pellegrino* has nothing relevant to say on the issue of partial success.

*EPIC* is relevant, but it does not provide any support for the trial court's "partial success" determination. In *EPIC*, multiple parties challenged several different approvals related to a logging plan. They were initially fully successful in the trial court, and the trial court awarded attorney's fees. (*EPIC*, *supra*, 190 Cal.App.4th at p. 223.) After the California Supreme Court reviewed the merits and concluded that the plaintiffs were entitled to prevail on only a couple of their claims concerning only some of the approvals, the case was remanded to the Court of Appeal to consider the defendants' challenges to the attorney's fees awards. (*EPIC*, at pp. 224-227.) The Court of Appeal's opinion was intended to provide guidance to the trial court on remand so that the trial court could resolve a number of remaining issues concerning the fees award, including whether the plaintiffs were entitled to awards and the amounts of any awards. (*EPIC*, at pp. 236-238.) The Court of Appeal described the two-step *Hensley* approach and made the determination that the successful and unsuccessful claims were related. (*EPIC*, at

22

pp. 238-247.)  However, the Court of Appeal left to the trial court the " 'factual' " issues of whether the awards should be reduced because "the relief . . . obtained was limited in comparison to the scope of the litigation as a whole." (*EPIC*, at p. 247.)

The trial court's determination of the "partial success" issue seems to have been a product of its reliance on these cases.  Although the trial court stated that it was utilizing the two-step *Hensley* approach, it failed to properly apply that approach.  The court made no attempt to distinguish between "claims" and "theories," which, as both *Hensley* and *EPIC* make clear, is necessary in order to determine whether a party has achieved only a partial success.  "California courts have tended to distinguish *theories* and *claims* by comparing the goals or objectives of the plaintiff's litigation with the relief ultimately obtained." (*EPIC*, *supra*, 190 Cal.App.4th at p. 240, italics added.)  "[T]he court's rejection of or failure to reach certain grounds [or contentions] is not a sufficient reason for reducing a fee.  The result is what matters." (*Hensley*, *supra*, 461 U.S. at p. 435.) "Where plaintiffs are entirely successful on all their *claims* for relief, it is not important that some of the legal *theories* used to support those claims were not found meritorious, so long as the plaintiffs did prevail." (*Sokolow*, *supra*, 213 Cal.App.3d at p. 250, italics added.)

The trial court equated what it called Habitat's "claims" with the multiple "issues" that Habitat had raised in its appeal to this court on the merits, most of which had been "unsuccessful."  The trial court found that the unsuccessful "claims" were "directly related" to Habitat's successful "claim," but it concluded that Habitat had nevertheless failed "to justify full compensation."  Because most of Habitat's appellate *contentions* had been "unsuccessful," the trial court concluded that, "viewing the outcome of the litigation in light of the whole," Habitat "only achieved a 50 percent success"

Habitat contends that the trial court's conclusion that it had achieved only a partial success was erroneous because Habitat "attained both of its objectives" in this litigation by obtaining a judgment requiring the City to vacate both its certification of the EIR and

23

its approval of the project. Habitat acknowledges that some of its "alternative theories" were "unsuccessful." However, it maintains that the failure of some of its *theories* did not authorize the court to reduce its fees because Habitat obtained all of the relief it sought and the trial court found that the unsuccessful theories were related to Habitat's successful claim.

When a successful party obtains the result it seeks, the court may not reduce the fee "simply because the plaintiff failed to prevail on every contention raised in the lawsuit." (*Hensley*, *supra*, 461 U.S. at p. 435.) "Section 1021.5 itself simply states that awards are to be made to successful parties, with no mention of excluding compensation for the successful parties' unsuccessful legal theories. Moreover, as a practical matter, it is impossible for an attorney to determine before starting work on a potentially meritorious legal theory whether it will or will not be accepted by a court years later following litigation. It must be remembered that an award of attorneys' fees is not a gift. It is just compensation for expenses actually incurred in vindicating a public right. To reduce the attorney's fees of a successful party because he did not prevail on all his arguments, makes it the attorney, and not the defendant, who pays the cost of enforcing that public right." (*Sundance v. Municipal Court* (1987) 192 Cal.App.3d 268, 273 (*Sundance*).)[8]

A successful party is entitled to recover fees for all time *reasonably expended* on the litigation. That does not mean that time spent on unsuccessful *theories* is *always* compensable. If a trial court finds that hours spent on unsuccessful legal theories were not time *reasonably expended*, it may exclude those hours in calculating the lodestar. (*Ketchum*, *supra*, 24 Cal.4th at p. 1132; *Donahue v. Donahue*, *supra*, 182 Cal.App.4th at

---

[8] When Habitat cited *Sundance* at the hearing, the trial court's response was that "Sundance still leaves it within the Court's discretion."

p. 271.)  However, the court may not reduce the fee award by applying a negative multiplier "simply because the plaintiff failed to prevail on every contention raised in the lawsuit."  (*Hensley*, *supra*, 461 U.S. at p. 435.)  The trial court has discretion "to determine whether time spent on an unsuccessful legal theory was reasonably incurred. . . .  [H]owever, . . . all time reasonably spent should be compensated."  (*Sundance*, *supra*, 192 Cal.App.3d at p. 274.)

"The distinction between diverse legal *theories* bearing on a particular 'right' that is established for purposes of section 1021.5 and unrelated 'claims' (which may have nothing to do with any rights established for purposes of section 1021.5) is important.  The core idea in *Sundance II* is that an attorney doesn't know beforehand which legal ideas will be accepted by a court—something that would seem particularly true in public interest litigation where a variety of constitutional theories may hover over the litigation like spirits offering themselves for conjuring.  So if the hours on the nonaccepted theories were 'reasonably spent,' not to include them in the fee award would deny the 'just compensation for expenses actually incurred in vindicating a public right.'"  (*Hammond v. Agran* (2002) 99 Cal.App.4th 115, 130, disapproved on a different point in *Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1226, fn. 4.)

The trial court expressly found that all of the hours expended on this litigation by Habitat's attorneys were reasonably expended, so its decision to apply a negative multiplier based on "partial success" could not be premised on the pursuit of unsuccessful *legal theories*.  While a negative multiplier may be applied where multiple *claims* were pursued and only some were successful, the same is not true where a party obtains all of the relief it sought and the only thing that was "unsuccessful" in the litigation was alternative *legal theories* for obtaining that relief.  Application of a negative multiplier based on partial success is not authorized where the successful party obtained the relief it sought and all of the hours were reasonably incurred.

25

Here, Habitat obtained all of the relief it sought. The City was ordered to vacate both its decision certifying the EIR and its approval of the project. The trial court's conclusion that Habitat had achieved only a partial success is inconsistent with this indisputable fact. It follows that the trial court's application of a negative multiplier based on partial success was an abuse of discretion. The appropriate remedy is a remand for the court to reconsider the multiplier issue under the law as set forth in this opinion.

### 4. Downward Adjustment of Fees For Fees Litigation

Habitat sought $55,499.26 in attorney's fees for litigating the fees motion. In its statement of decision, the trial court stated that it had applied a "downward adjustment" of 60 percent to these fees because the City and the Regents "did not create any extraordinary difficulties in this case . . . ."[9] "[F]ees for fee litigation may be *enhanced* when a defendant's opposition to the fee motion creates extraordinary difficulties." (*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 582-583, italics added.) The City and the Regents contend that it was proper for the trial court to use the *absence of extraordinary difficulties* as the basis for a *reduction* in fees. They cite *EnPalm, LLC v. Teitler* (2008) 162 Cal.App.4th 770 (*EnPalm*) and *Thayer* as support for this proposition. Neither provides such support. In *EnPalm*, the Court of Appeal held that "the trial court's use of equitable considerations to reduce the lodestar amount of appellants' attorney fees because most of those fees were unnecessary was proper . . . ." (*En Palm*, at p. 778.) In *Thayer*, the Court of Appeal found that a negative multiplier was

---

[9] At the hearing on the motion, the trial court noted that fees for the fees litigation may be *enhanced* when the opposition "creates extraordinary difficulties." The court also stated: "I'm going to reduce [fees for the fees litigation] by 60 percent to reflect a local reduced -- a local charge, a reduced legal analysis cost . . . ." The court's statement of decision provided only a single basis for the reduction: the City and the Regents had not created extraordinary difficulties. We consider only the reasoning stated in the court's statement of decision. (See footnote 7.)

26

authorized where there was a significant duplication of time by multiple attorneys. (*Thayer*, *supra*, 92 Cal.App.4th at p. 840)  The trial court made no findings in this case that the time spent by Habitat's attorneys on the fees litigation was "unnecessary" or duplicative.  As we remand for further proceedings that will necessarily impact the court's award of fees for the fees litigation, we will direct the trial court to reconsider its ruling on fees for the fees litigation after it has determined the appropriate amount of fees for the merits litigation.

### C.  Scope of Remand

The City and the Regents challenged the trial court's lodestar determination in their appeal.  We have concluded that the trial court did not abuse its discretion in finding that the hours claimed were reasonably expended and that the hourly rates were justified due to the need to retain non-local counsel and a contingency adjustment.  Consequently, the components of the lodestar calculation (the number of hours reasonably expended and the reasonable rate), which have been fully litigated and challenged unsuccessfully on appeal, may not be relitigated on remand.

Habitat challenged the trial court's imposition of a negative multiplier as to fees for the merits litigation and its setting of fees for the fees litigation.  It also contended that the trial court had erroneously failed to consider the contingent risk factor in setting the multiplier.  We have concluded that the trial court did not abuse its discretion in deciding that the contingent risk factor did not merit a positive multiplier.  However, we have also concluded that the trial court erred in applying a negative multiplier based on "partial success."  On remand, the trial court will have the opportunity to reconsider the entire multiplier issue.  The determination of the multiplier is a discretionary decision.  However, we do foreclose the trial court from again relying on "partial success" to impose a negative multiplier as the record establishes that Habitat was successful on its claims.  In all other respects, we commit the multiplier decision to the trial court's sound

27

discretion.  Since the issue of fees for the fees litigation is necessarily reopened by our remand, we commit that decision also to the trial court's discretion.

## VI.  Disposition

The trial court's attorney's fees order is reversed.  On remand, the trial court is directed to vacate its order and to reconsider, under the law as set forth in this opinion, its multiplier decision as to the fees for the merits litigation and its decision on fees for the fees litigation.  Habitat shall recover its appellate costs.

_____
Mihara, J.

WE CONCUR:

_____
Bamattre-Manoukian, Acting P. J.

_____
Márquez, J.